918 F.2d 123
 Richard SLANE and Linda Slane, Husband and Wife, Plaintiffs-Appellants,
v.
JERRY SCOTT DRILLING COMPANY, INC., an Oklahoma corporation;
Tuney Burger, Inc., an Oklahoma corporation;
Tuney Burger, Individually, Defendants-Appellees.
 No. 88-1264.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 2, 1990.
 
 Larry Tawwater (Ben T. Lampkin, John E. Vitali, with him, on the briefs), Lampkin, McCaffrey & Tawwater, Oklahoma City, Okl., for plaintiffs and appellants.
 Earl D. Mills (Joseph T. Acquaviva, with him, on the brief), Mills, Whitten, Mills, Mills & Hinkle, Oklahoma City, Okl., for defendant-appellee Jerry Scott Drilling Co., Inc.
 Jim W. Lee (Manville T. Buford and C. Scott Buech, with him, on the brief), Lee, Beuch, Buford, Durocher & Mauritson, Oklahoma City, Okl., for defendants-appellees Tuney Burger, Inc. and Tuney Burger, Individually.
 Before BALDOCK and EBEL, Circuit Judges, and BARRETT, Senior Circuit Judge.
 BARRETT, Senior Circuit Judge.
 
 
 1
 Richard and Linda Slane appeal from a judgment entered following a jury trial and verdict granted in favor of Jerry Scott Drilling Company (Scott Drilling), Tuney Burger, Inc. (Burger), and Tuney Burger, individually. The Slanes initiated this action after Richard was severely burned following an explosion on an oil drilling rig where he was working. The relevant facts are not in dispute.
 
 
 2
 In early 1985, Wessley Energy (Wessley), a non-party to this action, commenced drilling an oil well (Cargo 1-4) in McClain County, Oklahoma. Wessley contracted separately to obtain Scott Drilling as its drilling contractor, and Tuney Burger, doing business as Tuney Burger, Inc., as its consultant and on-site supervisor. Wessley also hired Monarch Testers, Inc. (Monarch) to conduct drill stem tests on the well. Monarch employed Richard Slane as a drill stem tester and assigned him to Cargo 1-4.
 
 
 3
 Drill stem tests are utilized to obtain well information including bottom hole pressure, types of fluids, and the amount of flow at specific depths within a well. Such tests are generally performed by "pulling wet" or "reverse circulation." Pulling wet involves pulling the drill pipe from the well with the oil and gas in place through the process. Reverse circulation involves pumping mud into the well bore under pressure and forcing the oil and gas to the surface and into a tank or pit. Of the two methods, reverse circulation is considered the safest but less satisfactory for obtaining certain geological data.
 
 
 4
 On February 5, 1985, Burger called Wessley and inquired whether to conduct a wet or dry (reverse circulation) drill stem test on Cargo 1-4. Wessley instructed Burger to "pull wet." Burger, in turn, instructed Richard Slane to perform the drill stem test by pulling wet. During the test, Richard was seriously injured following an explosion and subsequent fire.
 
 
 5
 The Slanes subsequently sued Scott Drilling and Burger, alleging that they were wholly and solely responsible for the safe operation of the rig at Cargo 1-4 and that Richard's injuries were the direct result of their negligence. The Slanes sought damages of $2,500,000.00.
 
 
 6
 Within its answer, Burger denied any liability. As affirmative defenses, Burger alleged that: the accident was the result of the negligence of a third party over whom they had no control or supervision; Richard was guilty of negligence of a greater degree than any negligence of Burger and Scott Drilling; and Richard's negligence bars any recovery against Burger and Scott Drilling. Burger also alleged that the accident was unavoidable and occurred without any negligence on the part of Burger and Scott Drilling.
 
 
 7
 Within its answer, Scott Drilling also denied any liability, and alleged that: the Slanes' complaint failed to state a viable cause of action; Richard was negligent and his negligence caused or contributed to the accident; Richard voluntarily assumed the risk of a known danger; Scott Drilling was confronted with a sudden emergency not brought about by its negligence and it reacted as a reasonable and prudent person would have reacted under the circumstances; and the accident was proximately caused by the negligence of a third party over whom Scott Drilling had no control. Scott Drilling also cross-complained against Burger for indemnity and/or contribution.
 
 
 8
 During the trial, the Slanes presented evidence that pulling wet was dangerous, that Burger instructed the tool pusher on the well to begin the test in question, and that Burger directed Richard to conduct the test by pulling wet. The Slanes' expert witness testified that he never pulled wet under conditions which existed in this case because the risk of exposing liquid carbons on the rig floor was unjustified. He opined that pulling wet was an unnecessary risk in this case.
 
 
 9
 Richard testified during direct examination that he had worked in the oil fields for approximately thirty years; Monarch did a lot of work for Wessley; he had worked with Burger and Scott Drilling crews on prior occasions; he knew it was dangerous to pull wet; he had worked with Burger on 60 to 75 tests where he had pulled wet; a wet test is dangerous only 15 to 20 per cent of the time; and, although he had an assumption, a calculated guess, he did not know what ignited the fire.
 
 
 10
 On cross-examination, Richard testified that "any time you pull a wet string of hydrocarbons it can be dangerous" (R., Vol. II at p. 157); he had pulled probably 300 wet tests overall; he had never experienced an explosion until this one; the oil-gas ratio on this well was higher than on most he had worked on but was perhaps equal to many that he had done in the past; he had never before had an accident during a test; he had worked with the Scott Drilling crew before and found the crew to be a highly proficient group of individuals ("it's probably one of the best drill stem test crews I've ever worked with in my life.") (R., Vol. II at p. 171); he had worked with Burger before and did not remember Burger starting a fire before; occasionally people get injured through no fault of anybody; Burger was "the authority on location" (R., Vol. II at p. 171); Burger was responsible to see that Richard performed his job to completion; Burger did not tell Richard how to set his tool; when he is out on a rig, he is in charge of his safety; and experienced men always watch out for themselves first and one other man.
 
 
 11
 Burger defended on the basis that Wessley was at all times the owner of the well and, as such, controlled the methods and procedures by which the well was to be drilled and tests to be conducted; Burger, as Wessley's consultant, relayed Wessley's orders and directions and was at the well to assure compliance with Wessley's orders and directions; Scott Drilling contracted separately with Wessley and provided all of its own equipment and personnel; Monarch was Wessley's preferred drill stem tester and Burger was to have Monarch perform the drill stem tests if Monarch was available; Richard was the drill stem tester usually furnished by Monarch and Richard was in charge during the course of the drill stem test; and Wessley made the decision to pull wet on the drill stem test being conducted at the time of the accident.
 
 
 12
 Scott Drilling defended on the basis that it was hired by Wessley to drill the well; Burger, as the drilling supervisor/consultant, was the highest ranking person on the well; Richard was very knowledgeable in the oil field and his knowledge as a drill stem tester was superior to that of anyone else on Scott Drilling's crew; Richard appreciated the dangers of pulling wet; there was sufficient evidence in the record to indicate that none of the defendants was negligent; although the evidence was conflicting on certain issues, the effect and weight to be given conflicting testimony was for the jury to decide; and there was sufficient evidence upon which the jury could have concluded that Richard was fully aware of the risks associated with a drilling rig and oil field operations and that he voluntarily assumed the risks.
 
 
 13
 During closing arguments, counsel for Burger suggested that perhaps Richard was contributorily negligent. The Slanes objected at the conclusion of Burger's closing arguments and the court directed the jury to disregard any suggestions of contributory negligence. Within its instructions to the jury, the court instructed on sudden emergency and assumption of risk in accordance with the affirmative defenses advanced by Scott Drilling.
 
 
 14
 The jury returned a verdict in favor of Burger and Scott Drilling and against the Slanes. The Slanes subsequently moved for judgment notwithstanding the verdict, an amendment of the judgment, and, in the alternative, a new trial. In support of their motions, the Slanes argued that the court's instructions on assumption of risk and sudden emergency were improper and that the closing argument comments of Burger's counsel regarding contributory negligence were highly prejudicial requiring a judgment notwithstanding the verdict. The motions were denied via a minute order.
 
 
 15
 On appeal, the Slanes contend: (1) the sudden emergency instruction misled the jury; (2) the court erred in giving an assumption of risk instruction; and (3) Burger's counsel committed reversible error by introducing extraneous matter during closing arguments.
 
 I.
 
 16
 The Slanes contend that the sudden emergency instruction misled the jury. The Slanes argue that the evidence did not support a sudden emergency instruction and that the instruction given to the jury did not represent the law of Oklahoma.
 
 
 17
 Although the determination of the substance of a jury instruction in a diversity case is a matter of state law, Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1296 (10th Cir.1989), the grant or denial of tendered instructions is governed by federal law and rules. Harvey by Harvey v. General Motors Corporation, 873 F.2d 1343, 1352 (10th Cir.1989), citing Brownlow v. Aman, 740 F.2d 1476, 1490 (10th Cir.1984). Where an erroneous instruction is given, we review the record to determine if prejudice resulted. Palmer v. Krueger, 897 F.2d 1529, 1532 (10th Cir.1990). We find reversible error in a trial court's jury instructions only if we have substantial doubt that the instructions, taken together, properly guided the jury in its deliberations. Mitchell v. Mobil Oil Corporation, 896 F.2d 463, 468 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990).
 
 
 18
 Under Oklahoma law, a trial court may instruct on sudden emergency only if (1) there are facts sufficient to raise an inference of sudden emergency, and (2) it is made to appear that the emergency was not created by the party seeking the instruction. Johnson v. Wade, 642 P.2d 255, 260 (Okla.1982), quoting Carnes v. White, 511 P.2d 1101 (Okla.1973). Oklahoma recognizes the existence of a sudden emergency as a separate, pleadable defense, and a defendant is obligated "to both plead the existence of such condition and to prove that he did not contribute to its creation." Lilly v. Scott, 598 P.2d 279, 282 (Okla.App.1979), citing Vaughn v. Baxter, 488 P.2d 1234 (Okla.1971).
 
 
 19
 Applying these standards to the facts herein, we hold that the court erred in instructing on sudden emergency.[1]
 
 
 20
 Although only Scott Drilling plead the defense of sudden emergency, the court instructed the jury:
 
 
 21
 One of the defenses plead by the defendants in this case is that of sudden emergency. If you find that the defendants were faced with a sudden emergency and reacted to that emergency as a reasonable person would have acted under the circumstances, then your verdict must be for the defendants and against the plaintiffs. (Emphasis supplied.)
 
 
 22
 (R., Vol. I, Tab 65, Instruction 14).
 
 
 23
 Burger did not plead the existence of sudden emergency. Even so, the court's sudden emergency instruction improperly applied to all the defendants. As such, the instruction violated Lilly v. Scott, supra, in which the court held that a defendant was "obliged" to plead the existence of sudden emergency.
 
 
 24
 Furthermore, the sudden emergency instruction given stated the law of Oklahoma incorrectly in that it failed to inform the jury that the defense was not available to the party or parties who created the emergency, Johnson v. Wade, supra. The absence of this element from the instruction given in this case misguided the jury.
 
 
 25
 Inasmuch as the court's sudden emergency instruction erroneously included all the defendants and misstated that defense under the laws of Oklahoma, we hold that the instruction gave rise to reversible error. Mitchell v. Mobil Oil Corporation, supra.
 
 II.
 
 26
 Even though the Slanes opposed giving any assumption of the risk instruction, they did submit such an instruction which the court accepted and gave. On appeal, the Slanes contend that the court erred in giving an assumption of risk instruction and that the evidence offered at trial simply did not support that instruction. We disagree.
 
 
 27
 "The defense of ... assumption of risk shall, in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury." Okla. Const., Art. 23, Sec. 6. In Thomas v. Holliday, 764 P.2d 165, 169 (Okla.1988), the court held:
 
 
 28
 Another aspect of risk assumption arises from Roman law and is the source of much confusion. This concept is encapsulated in the maxim volenti non fit injuria, which means: If one, knowing and comprehending the danger, voluntarily exposes himself to it, though not negligent in so doing, he is deemed to have assumed the risk and is precluded from recovery for the resulting injury. The maxim is predicated upon the theory of knowledge and appreciation of the danger and voluntary assent. A subjective standard is applied in evaluating plaintiff's knowledge, comprehension and appreciation of the risk.
 
 
 29
 The touchstone of the assumption-of-risk defense is consent to harm and not heedlessness or indifference.
 
 
 30
 We recently followed Thomas v. Holliday, supra, in Palmer v. Krueger, 897 F.2d 1529, 1534 (10th Cir.1990) where we held:
 
 
 31
 Under the law of Oklahoma, the "touchstone" of the assumption of risk defense in a negligence action is "consent to harm and not heedlessness or indifference." See Thomas v. Holliday, 764 P.2d 165, 169 (Okla.1988). Also, 'knowledge of the danger is an essential of the defense of assumption of risk, and the doctrine does not apply unless the one alleged to have assumed the risk can be found to have known or to have been charged with knowledge of the danger.' Briscoe v. Oklahoma Natural Gas Co., 509 P.2d 126, 129 (Okla.1973) (quoting syllabus to S.H. Kress & Co. v. Maddox, 201 Okla. 190, 203 P.2d 706 (1949).
 
 
 32
 Applying these standards to the facts herein, we hold that the court did not err in instructing on assumption of risk. Richard was imminently aware of the inherent dangers in and about the oil field and uniquely aware of the dangers of a drill stem test. As such, once he voluntarily went to Cargo 1-4 to perform the drill stem test, he was "deemed to have assumed the risk and is precluded from recovery for the resulting injury." Thomas v. Holliday, supra.
 
 
 33
 It was uncontested that Richard had over thirty years experience in oil field work and was considered to be a very good tester. Richard personally testified that: he was the supervisor for the drill stem test; he had pulled some 300 wet drill stem tests; he knew it was dangerous to pull wet; he considered the oil field, at its best, to be somewhat dangerous and, at its worst, to be deadly; when on a rig he was in charge of his own safety; and experienced men always watch out for themselves first and one other man.
 
 III.
 
 34
 The Slanes contend that counsel for Burger committed reversible error by improperly introducing extraneous matter during closing argument. Prior to closing arguments the court instructed counsel not to discuss comparative negligence. Notwithstanding this admonition, counsel for Burger made the following statements during his closing arguments:
 
 
 35
 And was Mr. Slane at fault for not telling Tuney Burger, 'Hey, this is really a bad one. I think that it is dangerous. I think that we ought to talk about it.' He didn't even do that. Did that make him at fault?
 
 
 36
 To use the logic that Tuney Burger was at fault for doing the same thing, for not saying this to the company--which he did say, by the way--makes Mr. Slane just as [much] at fault. I cannot see the negligence on anybody in this case.
 
 
 37
 (R., Vol. IV at p. 655).
 
 
 38
 The Slanes did not object at the time that the comments were made. However, they did object at the conclusion of Burger's closing arguments. Thereupon, the court instructed the jury that contributory negligence was not an issue in the case and "therefore, if any such suggestion was made to you ... and I'm not prepared to say it was. But if any suggestion like that was made to you, you should disregard it." (R., Vol. IV at p. 659).
 
 
 39
 We will not reverse on an improper closing argument unless it obviously prejudiced one of the parties. Smith v. Atlantic Richfield Company, 814 F.2d 1481, 1488 (10th Cir.1987). Although not proper, we hold that the closing argument of Burger did not obviously prejudice the Slanes. Notwithstanding the Slanes' failure to object in a timely manner, the court nonetheless instructed the jury to disregard any suggestion of contributory negligence. Under such circumstances, the prejudice to the Slanes, if any, was minimal.
 
 
 40
 REVERSED AND REMANDED for further proceedings consistent herewith.
 
 
 
 [1]
 We also have reservations whether the sudden emergency instruction was appropriate in any respect. The Slanes did not allege any negligence on the defendants' part after the explosion and fire. Rather, the Slanes alleged only that the defendants were negligent in the events leading up to the explosion and fire, during which there was no sudden emergency. However, assuming that the instruction was otherwise warranted, we hold that the district court nonetheless erred in the manner in which the instruction was given