**Sandra Jean GRIFFITH, individually and on behalf of Felicia Renee Griffith, Benjamin Lee Griffith, and Jonathan Andrew Griffith, minors and heirs at law of Jimmy R. Griffith, Jr., deceased, Plaintiff,**

v.

**MT. CARMEL MEDICAL CENTER, a Kansas Corporation; Eugene Carl McCormick, an Individual, Defendants.**

Civ. A. No. 92–1141–MLB.

United States District Court,
D. Kansas.

Jan. 19, 1994.

TX, John W. Johnson, Bradshaw & Johnson, Wichita, KS, for Sandra Jean Griffith.

Amy S. Lemley, Foulston & Siefkin, Wichita, KS, for Mount Carmel Medical Center, Inc., and Judith Ulery.

William Tinker, Jr., McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, for Eugene Carl McCormick.

E. Dudley Smith, Fisher, Patterson, Sayler & Smith, Overland Park, KS, for Physician Staffing Resources, Inc.

### MEMORANDUM AND ORDER

BELOT, District Judge.

This matter comes before the court on defendant Mount Carmel Medical Center's Motion for New Trial (Doc. 311) and defendant Dr. Eugene Carl McCormick's Motion for Remittitur and New Trial (Doc. 309). The case arises out of events surrounding the treatment of plaintiff's deceased husband, Mr. Jimmy Griffith, at Mount Carmel Medical Center in Pittsburg, Kansas on May 10 and 11, 1991. The facts of the case previously have been summarized in the court's Memorandum and Order denying defendant Mount Carmel's motion for partial summary judgment. (Doc. 272). *Griffith v. Mt. Carmel Medical Center,* 831 F.Supp. 1532, 1534–35 (D.Kan.1993). A jury trial was held on the issues presented, and the jury rendered a verdict in favor of plaintiff against both defendants. (Doc. 302). The jury found that defendant Mount Carmel violated the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, by failing to provide Mr. Griffith both an "appropriate medical screening" and stabilizing medical treatment on May 11, 1991, and that both defendant Dr. McCormick and defendant Mount Carmel's nurses had been negligent. With respect to the negligence findings, the jury attributed seventy percent (70%) of the fault to Dr. McCormick and thirty percent (30%) to Mount Carmel's nurses. The jury awarded damages in the sum of $2,003,000, with $503,000 going to Mrs. Griffith and $500,000 going to each of Mr. Griffith's three children.

Richard W. Lowry, Logan & Lowry, Vinita, OK, Alan Laufman, J.D., M.D., Dallas,

## DEFENDANTS' MOTIONS
## FOR NEW TRIAL

The defendants assert that they are entitled to a new trial on a number of grounds,[1] each of which will be dealt with herein. Initially, however, the court will note that the decision of whether to grant a motion for a new trial is committed to the sound discretion of the trial court. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); *Royal College Shop, Inc. v. Northern Ins. Co.,* 895 F.2d 670, 677 (10th Cir.1990). "Such a motion may be granted when the court believes the verdict to be against the weight of the evidence, when prejudicial error has entered the record, or when substantial justice has not been done." *Foster v. Bd. of Trustees of Butler Cty. Com. Col.,* 771 F.Supp. 1122, 1125 (D.Kan.1991) (citing *McHargue v. Stokes Div. of Pennwalt Corp.,* 912 F.2d 394, 396 (10th Cir.1990); *Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 637 (10th Cir.1988); *Holmes v. Wack,* 464 F.2d 86, 88–89 (10th Cir.1972)). The moving party "must demonstrate trial errors which constitute *prejudicial* error or that the verdict is not based on substantial evidence." *White v. Conoco, Inc.,* 710 F.2d 1442, 1443 (10th Cir. 1983). "[N]o error in any ruling or order or in anything done or omitted by the trial court or by the parties is ground for granting a new trial ... unless the error or defect affects the substantial rights of the parties." *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.,* 571 F.2d 1144, 1149 (10th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978) (citing Fed.R.Civ.P. 61).

### I. *Plaintiff's Counsels' Closing Arguments*

■ Both defendants claim that a number of improper remarks made by plaintiff's counsel during their closing arguments prejudiced and inflamed the jury, as manifested in the jury's inflated damages award. (Doc. 309, pp. 9–12; Doc. 312, pp. 20–24). Specifically, the defendants point to Mr. Alan Lauf-

man's remarks concerning his own "sense of anger" about this case and Mr. Richard Lowry's comments that "the hospitals are anxiously awaiting your [the juror's] decision" and that he "wouldn't take a million dollars for [his] wife and kids." (Transcript, Doc. 310, pp. 39–40, 84, 91).

The Tenth Circuit has consistently demonstrated " 'great caution' " in determining whether to set aside a jury's verdict because of improper remarks made by counsel. *Lambert v. Midwest City Mem. Hosp. Auth.,* 671 F.2d 372, 375 (10th Cir.1982) (quoting *Texas Eastern Transmission Corp. v. Marine Office–Appleton & Cox Corp.,* 579 F.2d 561, 567 (10th Cir.1978) and *Julander v. Ford Motor Co.,* 488 F.2d 839, 842 (10th Cir.1973)). The court has indicated that a jury's verdict should not be disturbed for this reason " 'unless it clearly appears that the remarks in question unduly aroused the sympathy of the jury and thereby influenced the verdict.' " *Id.* More recently, the court has stated that it "will not reverse on an improper closing argument unless it *obviously* prejudiced one of the parties." *Slane v. Jerry Scott Drilling Co., Inc.,* 918 F.2d 123, 128 (10th Cir.1990) (emphasis added) (citing *Smith v. Atlantic Richfield Co.,* 814 F.2d 1481, 1488 (10th Cir.1987)).

After careful consideration of plaintiff's counsels' remarks and their possible effect on the jury's verdict, the court finds that "[t]aken as a whole, the statements of [plaintiff's] counsel during closing arguments are more appropriately characterized as zealous advocacy rather than prejudicial conduct." *Mason v. Texaco, Inc.,* 741 F.Supp. 1472, 1513 (D.Kan.1990), *aff'd and remanded,* 948 F.2d 1546 (10th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). It is true that plaintiff's counsel made comments that were inappropriate, referring to their own personal indignation, asking the jurors to "send a message," and suggesting that the jurors put themselves in plaintiff's position, the infamous "Golden Rule" argu-

---

1. Mount Carmel reserves the right to raise on appeal claims of error not set forth in its motion. The court notes, however, that Mount Carmel does not reserve any claim that the jury's verdict on liability was contrary to or not supported by the evidence. This is as it should be. The evidence was more than sufficient to justify the jury's decision on liability as to both Mount Carmel and Dr. McCormick.

ment. Nevertheless, when plaintiff's counsels' remarks are placed in context—that is, in light of all the evidence, the length of the trial, the overall content of the closing arguments, and the "hotly contested" nature of this case—the court does not perceive any *obvious* prejudice. *Julander,* 488 F.2d at 842. Defense counsel immediately objected to Mr. Lowry's "send a message" and "Golden Rule" arguments, and the court swiftly and with certainty sustained those objections. (Transcript, Doc. 310, pp. 84, 91). *See Spulak v. K Mart Corp.,* 894 F.2d 1150, 1155–56 (10th Cir.1990) (finding that, when viewed in context, plaintiff's counsel's "send K Mart a message" argument did not prejudice defendants); *Blevins v. Cessna Aircraft Co.,* 728 F.2d 1576, 1580–81 (10th Cir.1984), *cert. dismissed,* 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984) (finding that, when viewed in context, plaintiff's counsel's "Golden Rule" and other improper arguments did not prejudice defendants). Moreover, the court instructed the jury that "any ... arguments made by the lawyers are not evidence in the case." (Jury Instructions, Doc. 300, Inst. # 6). *See Massie v. Godfather's Pizza, Inc.,* 844 F.2d 1414, 1424 (10th Cir.1988) (involving similar curative instruction).

With respect to Mr. Laufman's comments on his own personal indignation and, generally, counsel injecting their own feelings into closing argument, the court believes that it is important to note that although the cold trial transcript may not reflect it, the personal feelings of plaintiff's and Mount Carmel's attorneys had become abundantly clear well before closing arguments were made. This was a long trial involving, from plaintiff's perspective, emotional issues arising from the seemingly unexplained and unnecessary death of a young husband and father due to the failure of Dr. McCormick and Mount Carmel's nurses to provide proper care. Mount Carmel sought to capitalize on its religious-based affiliation in attempting to counter plaintiff's claims that it had refused to admit Mr. Griffith because he was uninsured. During trial, counsel for each party diligently and forcefully advocated their re-

spective client's interests. This culminated in somewhat emotionally charged closing arguments, particularly by plaintiff's and Mount Carmel's lawyers. Nevertheless, viewing plaintiff's counsels' remarks in the context of the whole trial, the court does not find that they unduly aroused the sympathy of the jury, thereby influencing the verdict. It is far more plausible that the jury's verdict was a result of the substantial evidence that Dr. McCormick and Mount Carmel committed medical negligence and that Mount Carmel violated EMTALA.

## II. Verdict Contrary to Plaintiff's Proof on Informed Consent

■ Dr. McCormick argues that he is entitled to a new trial because the jury's verdict was contrary to the evidence on the issue of informed consent. (Doc. 309, pp. 12–14). According to Dr. McCormick, plaintiff failed to meet her burden to show that, had Mr. Griffith been fully informed of the risks associated with pursuing Dr. McCormick's recommended course of treatment, he would have refused that treatment.[2] (Doc. 309, p. 14). However, as plaintiff aptly demonstrates, Dr. McCormick is wrong.

Plaintiff presented evidence, including the testimony of a Mount Carmel employee, indicating that she wanted Mr. Griffith to be admitted to the hospital during Mr. Griffith's second visit. Mr. Griffith was not admitted, but instead was discharged from the emergency room with advice to return if he got any worse, or words to that effect, and to see a local physician the following week for an EEG. Assuming *arguendo* that Dr. McCormick's pre-discharge comments can be construed as a choice of a course of treatment, the advice was flawed because Dr. McCormick misdiagnosed Mr. Griffith's condition. If Dr. McCormick had made a correct diagnosis and informed Mr. Griffith of the risks of going home as opposed to arranging for his admission to the hospital, it is reasonable to assume that Mr. and Mrs. Griffith would have chosen to keep Mr. Griffith at the hospi-

---

**2.** Dr. McCormick acknowledges that the court correctly instructed the jury on plaintiff's in-

formed consent claim. (Doc. 309, p. 14).

tal. However, the Griffiths were not given that choice.

More importantly, informed consent was merely one of a number of theories upon which plaintiff relied as the basis for her negligence claim against Dr. McCormick. The most obvious of these theories was, quite simply, that Dr. McCormick failed to exercise the requisite care in attempting to ascertain the source of Mr. Griffith's maladies and discharged him from the hospital when he needed to be admitted for further diagnosis and care. This theory did not depend on any proof concerning the issue of informed consent and it is, logically, the theory upon which the jury's liability finding against Dr. McCormick is based.

### III. *Comparative Fault Should Have Been Applied to EMTALA*

■ Mount Carmel argues that it is entitled to a new trial because Kansas comparative fault law should have been applied to plaintiff's EMTALA claims. (Doc. 312, pp. 14–20). This issue received considerable attention from the court before it instructed the jury, and the court's views have not changed since that time. Mount Carmel, nevertheless, is persistent in raising it.

Mount Carmel contends that because, as the court in a prior order acknowledged, the only *damages* available to plaintiff under EMTALA were those available under state law—in this case, the Kansas wrongful death statutes—comparative fault should have been applied. *See Griffith v. Mt. Carmel Medical Center,* 826 F.Supp. 382, 384–85 (D.Kan. 1993). What Mount Carmel fails to acknowledge, however, is that lumping plaintiff's negligence and EMTALA claims together and applying comparative fault to them as a whole would have subverted the plain meaning and intent of 42 U.S.C. § 1395dd(d)(2)(A).

It is well established in this circuit and elsewhere that a plaintiff is *not* required to prove that a hospital acted negligently in order to recover under EMTALA. *Abercrombie v. Osteopathic Hospital Founders*

*Ass'n,* 950 F.2d 676, 681 (10th Cir.1991). The Tenth Circuit also has made clear that EMTALA does not create a federal cause of action for medical negligence. *Collins v. DePaul Hospital,* 963 F.2d 303, 307 (10th Cir. 1992). Although Mount Carmel is aware of these cases, it consistently has refused to deal with them head-on.[3] Rather, it contends that because 42 U.S.C. § 1395dd(d)(2)(A) allows recovery of "damages available for personal injury under the law of the state in which the hospital is located," this court should have engrafted Kansas' comparative fault statute, K.S.A. 60–258a, onto § 1395dd(d)(2)(A) so as to limit Mount Carmel's EMTALA liability to a percentage of fault attributable to its EMTALA violations.

K.S.A. 60–258a, by its terms, is a comparative *negligence* statute. The term "comparative negligence" has evolved into "comparative fault," and Kansas courts, over time, have applied the concept of comparative fault to other tort causes of action such as "strict liability" in the context of products liability. *Lester v. Magic Chef, Inc.,* 230 Kan. 643, 645, 641 P.2d 353 (1982). Kansas courts have also extended comparative fault to tort-like or "negligence per se" claims predicated on violations of statutory prohibitions. *Arrendondo v. Duckwall Stores, Inc.,* 227 Kan. 842, 849–50, 610 P.2d 1107 (1980) (applying comparative fault in an action by a negligent minor to recover from a defendant who sold explosives to the minor in contravention of a statutory prohibition); *Thomas v. Bd. of Trustees of Salem Township,* 224 Kan. 539, 547, 582 P.2d 271 (1978) (applying comparative fault to claim based on state's violation of statutory duty to repair highway defect); *Wilson v. Probst,* 224 Kan. 459, 462, 581 P.2d 380 (1978) (same—highway defect case). At the same time, it has consistently refused to apply comparative fault in non-tort cases such as breach of contract. *Federal Savings & Loan Ins. Corp. v. Huff,* 237 Kan. 873, 878, 704 P.2d 372 (1985); *Haysville U.S.D. No. 261 v. GAF Corp.,* 233 Kan. 635, 640, 666 P.2d 192 (1983).

---

**3.** In its motion for new trial (Doc. 311, p. 18), Mount Carmel mentions *Abercrombie* only in a

cryptic footnote.

■ A hospital's liability under EMTALA is not grounded upon tort concepts. An EMTALA plaintiff's claim does not rest on any proof that the hospital was negligent; it is predicated on the hospital's violation of a *federal* statute making the hospital strictly liable for any "personal harm" that "directly results" from that violation. 42 U.S.C. § 1395dd(d)(2)(A).[4] In this case, the jury determined that Mrs. Griffith and Mr. Griffith's children had suffered $2,003,000 in "personal harm"—that is, pecuniary "damages available for personal injury under the law of [Kansas]"—as a direct result of Mr. Griffith's death.[5] (Verdict Form, Doc. 300, p. 8). Accordingly, under the plain language of § 1395dd(d)(2)(A), Mrs. Griffith and Mr. Griffith's children were awarded $2,003,000 *from the hospital* for Mount Carmel's EMTALA violations. The fact that § 1395dd(d)(2)(A) allows recovery of *damages* available under state law does not transform the liability portions of the statute into a negligence or tort-based statute. The court adheres to its refusal to apply Kansas comparative fault to Mount Carmel's liability under EMTALA.[6]

## IV. *Excessiveness of the Jury's Verdict*

Dr. McCormick requests a remittitur and Mount Carmel seeks a new trial for reasons related to the allegedly "excessive" damages award granted by the jury. (Doc. 309, pp. 2–9; Doc. 312, pp. 2–14). The defendants assert a number of challenges to the court's damages instructions and the jury's application of those instructions to the evidence presented at trial. Before considering each of these challenges, the court will review the law generally applicable to new trial motions and motions for remittitur based on the excessiveness of a jury's verdict.

■ Fundamentally, it is the *jury's* job to decide damages. The jury "'is clothed with a wide latitude and discretion in fixing damages pursuant to the court's instructions, deemed proper to fairly compensate the injured party.'" *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1559 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992) (quoting *Bennett v. Longacre,* 774 F.2d 1024 (10th Cir.1985)). Nevertheless, if the amount of a jury's damages award is "so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial," the court *must* order a new trial. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith,* 703 F.2d 1152, 1168 (10th Cir.1981) (en banc) (plurality opinion), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). That is, if the court finds that a jury's damages award is excessive and that that excessiveness was a result of passion, prejudice or other improper cause, then a new trial *must* be granted. *Mason,* 948 F.2d at 1560–61. On the other hand, if the court finds the damages award to be excessive, but not the result of passion, prejudice, or other improper cause, the court *may* order a complete new trial, order a new trial limited to the issue of damages, or condition the denial of a

4. It seems perfectly logical that EMTALA is not a negligence-driven statute. As the court has made clear in its earlier order, EMTALA was enacted, in part, to stop "patient dumping." One may reasonably ask: How can a hospital negligently refuse to treat someone because he or she has no insurance?

5. During the conference on jury instructions, the court offered to give one verdict form upon which the jury could find the *total* amount of damages for purposes of plaintiff's negligence claims and another verdict form upon which the jury could find the amount of damages which *directly resulted* from Mount Carmel's violations of EMTALA. Counsel for Mount Carmel rejected these separate verdict forms, conceding that the amount of damages on both forms should be the same. That is, Mount Carmel conceded that the

damages which directly resulted from its violation of EMTALA were the same as the total damages for purposes of negligence.

6. The court is well aware that by not combining the negligence and EMTALA claims together and applying comparative fault to them as a whole, the hospital can end up paying for damages that are in essence attributable to the negligence of the doctor. A recent case, *McDougal v. LaFourche Hosp. Serv. Dist. No. 3,* No. CIV.A. 92–2006, 1993 WL 185647 (E.D.La. May 24, 1993), suggests that an action in indemnity is the appropriate means by which to solve this problem. That issue, if it arises, will be for another court to decide. Nevertheless, the court notes that, at trial, Mount Carmel did not overtly attempt to pin the blame for Mr. Griffith's death on Dr. McCormick's negligence.

motion for new trial on plaintiff's acceptance of a remittitur. 11 C. Wright, A. Miller & F. Elliott, *Federal Practice and Procedure* § 2815; *Mason*, 948 F.2d at 1560–61; *Malandris*, 703 F.2d at 1168; *Courtney v. Safelite Glass Corp.*, 811 F.Supp. 1466, 1472 (D.Kan.1992); *Foster v. Bd. of Trustees of Butler Cty. Com. Col.*, 771 F.Supp. 1122, 1126–27, 1132–33 (D.Kan.1991). To order a new trial on damages only, the court must be satisfied that the verdict did not represent a compromise among jurors and that any errors on the damages issue have not affected the determination of liability. *Mason*, 948 F.2d at 1552 (quoting 11 C. Wright, A. Miller & F. Elliott, *Federal Practice and Procedure* § 2814). The decision whether to grant a remittitur is governed by federal law, *Royal College Shop, Inc. v. Northern Ins. Co.*, 895 F.2d 670, 677 (10th Cir.1990), and, as with a new trial, rests within the broad discretion of the trial court. *Garrick v. City and County of Denver*, 652 F.2d 969, 971 (10th Cir.1981).

### A. *Errors in the jury instructions*

Both defendants contend that the court committed a number of errors in instructing the jury on damages. Dr. McCormick asserts that the jury's excessive verdict was based upon erroneous jury instructions and errors on the verdict form with respect to pecuniary damages. (Doc. 309, pp. 3–8). Mount Carmel likewise argues that the jury instructions and verdict form included itemized elements of damage that were not pecuniary in nature and resulted in an inflated damages award. (Doc. 312, pp. 4–6). Mount Carmel also argues that the court erred in refusing to instruct the jury to disregard evidence of nonpecuniary loss, (Doc. 312, pp. 10–14), and in instructing the jury to allocate damages between Mrs. Griffith and Mr. Griffith's children, (Doc. 312, pp. 8–9).

#### 1. *Errors in the instructions and the verdict form with regard to pecuniary and nonpecuniary loss*

As stated *supra*, the Kansas wrongful death statutes govern the damages available under both plaintiff's negligence and plaintiff's EMTALA claims, and those statutes provide for recovery of both pecuniary and nonpecuniary loss. K.S.A. 60–1903(c) (Supp. 1992) states that a verdict in a wrongful death action shall be "itemized by the trier of fact to reflect the amounts, if any, awarded for: (1) Nonpecuniary damages; (2) expenses for the care of the deceased caused by the injury; and (3) pecuniary damages other than those itemized under subsection (c)(2)." K.S.A. 60–1904 (Supp.1992) further indicates that the following specific "elements of damage" are among those available: "(1) Mental anguish, suffering or bereavement; (2) loss of society, companionship, comfort or protection; (3) loss of marital care, attention, advice or counsel; (4) loss of filial care or attention; (5) loss of parental care, training, guidance or education; and (6) reasonable funeral expenses for the deceased." The Pattern Instructions for Kansas suggest that an instruction itemizing these elements and distinguishing between pecuniary and nonpecuniary damages be given in a wrongful death action. P.I.K.Civ.2d 9.30–31 (Supp. 1990). The PIK instructions identify mental anguish, bereavement, loss of society, comfort and loss of companionship as nonpecuniary losses. Loss of services, attention, marital or parental care, advice, and protection are identified as pecuniary losses.

In the present case, late in the trial, plaintiff's counsel verbally dismissed all claims for nonpecuniary damages. Accordingly, there was no need to instruct the jury on elements of nonpecuniary loss, and the only damages about which the jury was instructed and the only damage elements itemized on the verdict form were pecuniary in nature. The court instructed the jury, in that regard, as follows:

### A. *Damages allowable to Sandra Jean Griffith*

(1) Loss of services.

(2) Loss of attention, marital care, advice, and protection.

(3) Loss of earnings you find Jimmy R. Griffith would have provided.

(4) Funeral expenses.

For items (1) and (2) you should allow an amount which you believe to be equivalent to the monetary benefits or compensation Sandra Jean Griffith could reasonably have expected to receive in the future.

B. *Damages allowable to Felicia Renee, Benjamin Lee, and Johnathan Andrew Griffith*

(1) Loss of services.

(2) Loss of attention, parental care, advice and protection.

(3) Loss of their father's nurturing.

(4) Loss of the educational assistance of their father.

(5) Loss of the moral training and guidance of their father.

(6) Loss of the value of a complete family.

(7) Loss of financial support which you find Jimmy R. Griffith would have provided during the children's minority.

For each of these items, you should allow an amount which you believe to be equivalent to the monetary benefits or compensation Jimmy R. Griffith's children could reasonably have expected to receive from the continued life of their father.

The jury returned the following verdict:

(1) *Damages Sustained by Sandra Jean Griffith:*

| | |
|---|---|
| Loss of Earnings Jimmy R. Griffith would have provided | $450,000 |
| Loss of Services | 25,000 |
| Loss of Attention, Marital Care, Advice and Protection | 25,000 |
| Funeral Expenses | 3,000 |
| Total | $503,000 |

(2) *Damages Sustained by Jimmy R. Griffith's children, Felicia Renee, Benjamin Lee, and Johnathan Andrew Griffith:*

| | |
|---|---|
| Loss of Financial Support Jimmy R. Griffith would have provided during children's minority | $ 300,000 |
| | per child |
| Loss of Services | 20,000 |
| | per child |
| Loss of Attention, [Parental] Care, Advice and Protection | 20,000 |
| | per child |
| Loss of their father's nurturing | 20,000 |
| | per child |
| Loss of the educational assistance of their father | 20,000 |
| | per child |
| Loss of the moral training and guidance of their father | 20,000 |
| | per child |
| Loss of the value of a complete family | 100,000 |
| | per child |
| Total | $1,500,000 |

Mount Carmel and Dr. McCormick contend that the court erred in instructing the jury that it could award damages for loss of nurturing, loss of moral training and guidance, and loss of the value of a complete family. Their argument was, and remains, that these damages are not specifically set out in P.I.K.Civ.2d 9.30–31 and, in any event, are nonpecuniary in nature. Dr. McCormick, in particular, argues as follows:

These damages are nonpecuniary; they are not contemplated by P.I.K. or any other authority to be included in pecuniary damages. Instead, they are intangible in nature such as mental anguish and bereavement. Because plaintiffs dismissed their claim for nonpecuniary loss, defendant requests that the Court refuse the

verdict and order a remittitur for [these] damages....

(Doc. 309, p. 8).

Dr. McCormick is wrong. First, in *Wentling v. Medical Anesthesia Services, P.A.*, 237 Kan. 503, 509, 701 P.2d 939 (1985), the Kansas Supreme Court indicated that pecuniary damages was " 'anything that could be valued in terms of money,' " including " 'a loss arising from a deprivation of benefits to which [the plaintiff] would have been legally entitled' " as well as " 'a loss arising from a deprivation of benefits that could reasonably be expected to have been received, originating from no more than a moral obligation.' " (quoting Douthwaite, Jury Instructions on Damages in Tort Actions, Ch. 7–1, p. 270 (1981)). The *Wentling* case included an instruction identifying "loss of educational, physical, and moral training and guidance" as pecuniary damages, and the court itself stated . "[i]t cannot be seriously disputed that these losses are pecuniary in nature." *Id.* at 505, 508, 701 P.2d 939. Second, in *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 365, 837 P.2d 330 (1992), the Kansas Supreme Court, in upholding a jury's award of pecuniary damages to the children of a deceased mother, let stand jury instructions indicating that *pecuniary* loss included "loss of services, attention, parental care, advice and protection, *loss of their mother's nurturing, loss of the educational assistance of their mother,* loss of the counsel and advice of their mother, *loss of the moral training and guidance of their mother, loss of the value of a complete family,* and loss of financial support which [the mother] would have provided during the children's minority." [7] (emphasis added).

Mount Carmel argues that, in *Cerretti,* the Kansas Supreme Court did not "rule in any way" on the propriety of including loss of nurturing, moral training and guidance, value of a complete family, or educational assistance as "elements of pecuniary damage under the Kansas wrongful death statutes, and the Court clearly never even considered whether they were proper line items on a verdict form." (Doc. 312, p. 5). If Mount Carmel's interpretation of the *Cerretti* opinion is correct, however, then one must ask why the court found it necessary to even mention the trial court's instruction on what constitutes pecuniary damages. Surely, if the court, having reviewed the trial court's pecuniary damages instruction, believed that it erroneously included elements of *non*pecuniary damages, the court would have said so. This court must assume that the Kansas Supreme Court was mindful that by repeating the trial court's instruction and deciding not to disturb the jury's pecuniary damages award, it was casting favor upon the use of that instruction in future cases in Kansas district courts as well as diversity actions in this court.

 In any event, in viewing the evidence that had been presented by plaintiff concerning the damages that had been suffered by Mr. Griffith's children, it was clear to this court that the evidence supported damages for the children's loss of nurturing, loss of moral training and guidance, loss of educational assistance, and loss of the value of a complete family. Each of these types of loss appeared to be pecuniary in nature, given the Kansas Supreme Court's holdings in *Wentling* and *Cerretti,* and the court instructed the jury to that effect. The court's inclusion of these categories of pecuniary damages in the instructions and verdict form was merely an attempt to tailor the instructions and verdict form to reflect the evidence and to conform with Kansas law.[8] Certainly,

---

7. As defendant Mount Carmel correctly recognizes, the *Cerretti* case was referred to by the court during the jury instructions conference in support of the damages instruction and verdict form. (Doc. 312, p. 5).

8. The evidence of *pecuniary* loss flowing from the children's loss of their father's nurturing, *et cetera,* came almost exclusively from psychologist Samuel Harrell. As Mount Carmel correctly points out (Doc. 311, p. 7), the court expressed its opinion to counsel (but not the jury) that the testimony of psychologist Harrell virtually amounted to fraud. The court's opinion was *not* a rejection of the proposition that, properly presented and proved in the appropriate case, pecuniary loss may be shown to flow from a loss of nurturing, *et cetera.* Rather, the court's view was predicated on his perception of the lack of factual support for Harrell's opinion—that is, his willingness to state opinions when he knew so little about plaintiff's children and their deceased father. For example, Harrell testified at his de-

there was no error in the court's doing so.[9] On the contrary, it would have been error for the court not to do so.

## 2. The court's refusal to instruct the jury to disregard evidence of nonpecuniary loss

■ As discussed *supra*, late in the trial, well after plaintiff's presentation of her evidence, plaintiff's counsel verbally dismissed plaintiff's claim for nonpecuniary damages outside the presence of the jury. During her case-in-chief, plaintiff had offered testimony by psychologist Harrell that included references to the psychological effects of the death of Mr. Griffith on Mrs. Griffith and the children and the mental anguish suffered. Mount Carmel argues that upon plaintiff's dismissal of her claim for nonpecuniary damages, the court should have specifically instructed the jury to "disregard any evidence advanced by plaintiff that supported her claim for any elements of damage that are nonpecuniary." (Doc. 312, p. 11) (quoting proposed instruction submitted by Mount Carmel at trial). According to Mount Carmel, the court's refusal to give such an instruction left the jury with the impression that "nonpecuniary losses must fit into one or more of the purportedly pecuniary categories of damages on the Verdict Form." (Doc. 312, p. 13).

The court adheres to its belief that it was unnecessary to give Mount Carmel's requested instruction. The jury was properly instructed on the types of pecuniary damages it could award and Harrell's testimony, which the jury apparently chose to believe, arguably supported those types of damages. It was not necessary for the court to instruct the jury on the *non*pecuniary damages the jury could *not* award. Such an instruction would have been confusing, especially since the jury had not been preliminarily instructed on the differences between pecuniary and nonpecuniary damages.

## 3. Error in instructing the jury to allocate damages between Mrs. Griffith and Mr. Griffith's children

■ The court finds no error in its decision to provide the jury instructions and a verdict form which separately identified the kinds of pecuniary damages that may have been suffered by Mrs. Griffith, the surviving spouse, and the kinds of pecuniary damages that may have been suffered by Mr. Griffith's surviving children. Once again, this was merely an attempt to tailor the instructions and verdict form to reflect the evidence that had been presented at trial. K.S.A. 60–1905, which Mount Carmel contends mandates the division of damages between the heirs by the judge, does not, in the court's opinion, require the court to give the jury a vague, generalized verdict form devoid of any specifics as to what kinds of damages may be awarded and how they should be apportioned. Rather, it simply vests in the judge the authority to apportion the damages among the heirs at a subsequent hearing.

---

position (and presumably would have done so at trial if the court had allowed it) that Mr. Griffith's young daughter, Felicia, had a "33 percent chance that she is going to be sexually abused ... in the future ... if she hasn't had it already." (Harrell Depo., Doc. 250, pp. 82–83). Harrell gave this testimony without ever having met Felicia, her mother or her stepfather. Harrell's testimony at trial was different only in degree. Essentially, it was the same faux-scientific speculation supported primarily by his own self-serving judgment that his opinions were based upon "reasonable psychological probability." Had the court been the fact-finder, it would have totally disregarded Harrell's testimony. But the court was not the fact-finder; the jury was and it evidently accepted Harrell's testimony and utilized it in setting damages. As all trial lawyers know, this is one of the risks of the jury system. It does not serve as a legal basis for setting aside the jury's verdict.

**9.** In addition to its argument concerning *Cerretti*, defendant Mount Carmel has argued that nurturing, moral training and guidance, educational assistance, and value of a complete family are "needlessly repetitious" elements of damages. (Doc. 312, p. 5). The court, however, finds that the distinctions between these categories of damage are relatively clear and that average jurors can perceive those distinctions. Mount Carmel also complains that the court should have instructed the jury that it could leave blank or put a zero in any of the blanks. (Doc. 312, p. 6). In fact, the court did inform the jury that "the fact that I have instructed you on damages does not mean that I am indicating that you should award any." (Jury Instructions, Doc. 300, Inst. # 50). That instruction was sufficient.

K.S.A. 60–1905's chief concern is with the rights of the heirs of the decedent, not the rights of the defendants, in a wrongful death action. The court fails to see how the statute's application to the present case has any relevance to the total amount of damages attributable to Mount Carmel.

### B. *Jury Error in Applying the Damages Instructions*

Mount Carmel contends that it is entitled to a new trial due to errors on the part of the jury in applying the court's damages instructions to the evidence that was presented. As stated *supra*, the jury " 'is clothed with a wide latitude and discretion in fixing damages pursuant to the court's instructions, deemed proper to fairly compensate the injured party.' " *Mason*, 948 F.2d at 1559. Accordingly, the court should be predisposed toward upholding the jury's application of its instructions in the case at hand.

■■■ Mount Carmel attacks the jury's damages awards for loss of financial support ($450,000 for Mrs. Griffith and $300,000 per child) claiming it was excessive and contrary to plaintiff's own expert's testimony. (Doc. 312, pp. 2–4). Mount Carmel also challenges the jury's damages award with respect to Mr. Griffith's children's loss of attention, parental care, advice and protection ($20,000 per child), loss of their father's nurturing ($20,000 per child), loss of their father's educational assistance ($20,000 per child), loss their father's moral training and guidance ($20,000 per child), and loss of the value of a complete family ($100,000 per child). (Doc. 312, pp. 6–10). According to Mount Carmel, plaintiff's expert economist could "provide a reasonable basis for computing" only the damages for loss of financial support and the damages for loss of services and, hence, those damages, along with funeral expenses, were the only damages that should have been awarded. (Doc. 312, p. 7).

The court does not find that the jury's award for loss of financial support or for loss of attention, care, advice, protection, nurturing, moral training and guidance, educational assistance, and the value of a complete family is "so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial," and thus will not order a new trial on all issues. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152, 1168 (10th Cir.1981) (en banc) (plurality opinion), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). Although it is true that both experts for plaintiff declined to place a dollar value on damages for loss of attention, *et cetera*, the Kansas Supreme Court held, in *Wentling*, *supra*, that expert testimony on the specific monetary value of such damages is not necessary because "the triers of fact are presumed to be capable of converting the losses into monetary equivalents on the basis of their own experience." 237 Kan. at 513–14, 701 P.2d 939. Plaintiff, like the plaintiff in *Wentling*, sustained her burden of proving such damages and was entitled to have the jury consider such items in determining the total pecuniary loss. However, for the reasons stated *infra*, the court finds the jury's verdict excessive.

### C. *Defendant Dr. McCormick's Request for a Remittitur* [10]

As stated *supra*, a jury verdict's excessiveness, if not the result of passion, prejudice, or other improper motivation, can be cured through a remittitur. *Mason*, 948 F.2d at 1561. In the present case, although the court perceives no passion or prejudice on the part of the jury, the court is persuaded that the jury's verdict is, in some respects, excessive and not supported by the evidence. Accordingly, for the reasons set forth below, a remittitur will be ordered in the designated amounts.

■■■ First, the jury's total award for loss of financial support, $1,350,000, is not supported by the evidence. The interest alone on $1,350,000 would well exceed the largest annual income Mr. Griffith ever made

---

10. Mount Carmel has not requested a remittitur. Nevertheless, the court's order with respect to remittitur will apply to Mount Carmel as well as to Dr. McCormick. In other words, if plaintiff does not accept the remittitur and a new trial on damages is ordered, both Dr. McCormick and Mount Carmel will be defendants at that trial.

(around $18,000 in 1989) or could reasonably expect to make in the near future. From 1987 to 1991, Mr. Griffith's average annual income, including unemployment compensation, was only $9,034. (Transcript, Doc. 315, pp. 73–74). Plaintiff's expert economist, Dr. John Morris, whose testimony was quite credible, estimated that the total loss of financial support to the Griffith family would be around $800,000. (Doc. 315, pp. 18–19). Dr. Morris made this estimation assuming that Mr. Griffith decided to continue in the profession of truck driving and, in four years, would be working full time and receiving the average wages for a truck driver. (Doc. 315, pp. 9–10, 27). Given Mr. Griffith's employment history, including a number of extended periods during which Mr. Griffith was without work, even those limited assumptions were somewhat unsupported. The jury's award for loss of financial support in the amount of $1,350,000 is, in light of this testimony, grossly exaggerated. The court therefore orders that this award be reduced by $550,000 to $800,000. *See Miller v. Kansas Electric Power Cooperative, Inc.,* No. CIV.A. 87–4062–S, 1990 WL 120942, at *2 (D.Kan. July 6, 1990) (Saffels, J.) (finding damages award excessive and ordering remittitur because plaintiff's own expert testified that she was only entitled to an amount that was two-thirds the amount of the jury's award).

■■■ Second, the jury awarded Mrs. Griffith only $25,000 for loss of attention, marital care, advice and protection. By contrast, the jury awarded *each* of the Griffith children a total of $180,000 for loss of attention, marital care, advice and protection, loss of their father's nurturing, loss of the educational assistance of their father, loss of the moral training and guidance of their father, and loss of the value of a complete family. This massive award and the huge disparity between Mrs. Griffith's and the children's damages award is not supported by the evidence. Mrs. Griffith lost a husband, and the evidence unquestionably supported the jury's finding that the loss of her husband's attention, care, advice and protection was worth at least $25,000. The Griffith children lost a father, and the

court is sensitive to that fact. However, there is simply no way the evidence presented by plaintiff could reasonably support an award to each of the Griffith children equal to more than seven times the amount of the award given to Mrs. Griffith for basically similar losses. The court is particularly concerned with the $100,000 awarded to each child for the loss of the value of a complete family. Plaintiff asserts that the following "facts" support that award:

(1) The fact that this was a sudden death which did not allow the children to prepare *psychologically* for the loss of their father, ...;

(2) The fact that the young ages of the children made them more vulnerable to this injury;

(3) The fact that the two older children were essentially orphaned in that the only mother they really ever knew (for five years) was suddenly separated from them at the very time their father died;

(4) The fact that the two older children were also abruptly removed from the custody of the grandparents and left to feel that the grandparents "did not want them"; and

(5) The fact that the two older children were suddenly separated from their younger brother, Jonathan, thus exacerbating the injury to all three children.

In the court's view, "fact" (1) involves damages that are nonpecuniary in nature. Each of the remaining "facts" do relate to the breakup of the Griffith family, but the adverse economic effect of this family breakup was never clearly proven. Cheryl Ball, the biological mother of Felicia and Benjamin Griffith, testified that Felicia and Benjamin are living with her and her husband in their home, which appears to be relatively stable.[11] Plaintiff's experts were unable to ascertain the economic losses that would arise from the loss of a complete family, other than to *speculate* about how it might effect the children's ability to earn a living much later in life. In fact, both the economist and psychologist eschewed any ability to put a dollar value on

---

**11.** This evidence was taken into consideration only because plaintiff volunteered it.

this item. (Doc. 315, Testimony of John Morris, pp. 8, 25–26).

In *Wentling,* plaintiff's expert testified regarding damages for loss of care, services, and guidance, as well as losses "associated with the children growing up in a shattered family rather than a traditional nuclear family." 237 Kan. at 513, 701 P.2d 939. The expert apparently testified, similar to plaintiff's expert economist in the present case, that "[e]ven though it is difficult to place a dollar figure on such losses, ... they nevertheless have real economic value." *Id.* The court ultimately held that, once the plaintiffs "show[ed] such deprivation, it was for the jury to determine the dollar amount of the loss." *Id.* at 515, 701 P.2d 939.

In this case, the court has allowed the jury to determine the dollar amount of the loss, but, at least with respect to the jury's award for the loss of a complete family, the court finds that the jury's determination is not supported by substantial evidence and, in fact, contrary to the evidence. Thus, the court will, in accord with established principles concerning the "usual remittitur situation," "determine a reasonable amount as plaintiff's damages" for loss of the value of a complete family. *O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438, 1448 (10th Cir. 1987), *cert. denied, Playtex Holdings, Inc. v. O'Gilvie,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). In the court's view, a "reasonable amount" for these damages is $20,000 per child.

 Finally, with respect to the remaining damages, Dr. Morris estimated that the loss of household services resulting from Mr. Griffith's death equalled about $150,000. (Doc. 315, pp. 22–23). The jury awarded total damages for loss of services in the amount of $85,000. This amount was not excessive and will not be disturbed.

In reaching its decision regarding a remittitur, the court has given careful consideration to whether the jury's award of excessive damages requires a new trial on all issues or merely a new trial on damages. The court is satisfied that the jury's verdict on liability was based upon careful consideration of the evidence. The jury declined to find that Mount Carmel was negligent or that it violated EMTALA on May 10, 1991, when Mr. Griffith first came to the emergency room. It did find, however, that Dr. McCormick was negligent on both May 10 and 11 and that Mount Carmel was otherwise negligent and violated EMTALA on May 11. These findings were entirely consistent with the proof and demonstrate that the jury sorted through the evidence and followed the court's instructions. There is no reason to believe that the jury's verdict was a compromise or that its damages award somehow affected its verdict on liability. A new trial on all issues is not warranted. Therefore, if the court's remittitur is refused by plaintiff, a new trial on damages only will be held.

**IT IS ACCORDINGLY ORDERED** that defendant Mount Carmel Medical Center's and defendant Dr. Eugene Carl McCormick's motions for a new trial, (Docs. 311 & 309), are hereby denied. Defendant McCormick's motion for a remittitur (Doc. 309) is granted as follows: The jury's damages award for loss of financial support is hereby reduced to awards of $312,500 for Mrs. Griffith and $162,500 for each of the three Griffith children. The jury's damages award for loss of the value of a complete family is reduced to $20,000 for each of the three Griffith children.

Plaintiff will have ten (10) days from the date of this order to file a pleading which states whether she will accept the remittitur. In the event plaintiff refuses to remit the excess, the court will order a new trial on the issue of damages. If plaintiff agrees to the remittitur, whether under protest or not, she may not appeal to seek reinstatement of the original verdict. *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977).

Defendants' Motions for Stay of Execution Pending Resolution of Motion for a New Trial, (Docs. 306 & 308), are rendered moot.

The court does not encourage motions for reconsideration of this order. If such motions are filed, they will be limited to ten (10) pages. Responses likewise will be limited to ten (10) pages. No replies may be filed.

IT IS SO ORDERED.