Shelly TURMAN, et al., Plaintiffs,

v.

AMERITRUCK REFRIGERATED TRANSPORT, INC., and Robert C. Black, Defendants.

No. 99–2325–JWL.

United States District Court, D. Kansas.

Nov. 28, 2000.

Patrick A. Hamilton, Robert G. Herndon, Chartered, Overland Park, KS, Alan Higbie, Alan Higbie, Jr., Melat, Pressman, Ezell & Higbie, Colorado Springs, CO, Larry D. Goins, Goins Law Firm, St. Joseph, MO, for plaintiffs.

Richard T. Merker, Diane L. Waters, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, for Ameritruck Refrigerated Transport, Inc., Robert C. Black.

Richard D. Ralls, Farchmin Ralls Wagoner, P.C., Kansas City, MO, Michael A Walker, Walker & Associates, P.C., Denver, CO, for charles J. Turman, Chanda B. Turman.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This diversity suit arises from a motor vehicle accident which occurred on May 6,

1997, in Logan County, Kansas. Charles W. Turman ("decedent") sustained fatal injuries when the vehicle that he was driving was struck by a truck which had not stopped at a stop sign. On July 23, 1999, decedent's surviving spouse, employer, and insurance carrier filed suit, asserting wrongful death and property damage claims against the driver of the truck and the driver's employer. The parties subsequently reached a settlement agreement on the wrongful death claim. On June 16, 2000, plaintiff Shelly Turman, decedent's surviving spouse, filed a Motion for Approval of Settlement (Doc. 37), and the court scheduled a settlement hearing for July, 5, 2000. Before the settlement hearing, however, Charles J. Turman and Chanda B. Turman, the only natural children of decedent, moved to intervene in the wrongful death action (Doc. 42). The court granted the motion for intervention and local counsel for the intervening children participated in the settlement hearing. After receiving testimony supporting the reasonableness of the proposed settlement, a combination of cash and structured settlement with an estimated present value of $839,700 at the time of purchase, the court approved the same (Doc. 50). The court retained under advisement, however, the issue of how the settlement proceeds would be distributed. Specifically, the court directed the parties to submit briefs addressing the amount of the proceeds that should be used to pay attorneys fees and costs, the appropriate apportionment of the proceeds among decedent's three heirs, and the allocation of the settlement proceeds between pecuniary and nonpecuniary damages (Doc. 50).

The parties have heeded the court's directive and have filed their papers addressing these issues. Plaintiff has supplemented her original motion for approval of settlement (Doc. 37) with a single document entitled "Plaintiff Shelly Turman's Submissions to the Court Regarding Attorneys Fees and Costs, Apportionment, and Allocation" (Doc. 83). The interveners, on the other hand, have submitted separate motions on each of the three pending issues: (1) "Interveners' Motion for Apportionment Among the Heirs" (Doc. 78), (2) "Interveners' Motion for Approval of Attorney Fees and Costs" (Doc. 80), and (3) "Interveners' Motion Regarding Workers Compensation and Subrogation" (Doc. 82) (addressing allocation). The court is now prepared to rule on these four motions. As discussed below, the court has not accepted the complete plan proposed by either party for distributing the settlement proceeds, but instead has considered the evidence submitted by the parties and fashioned a distribution plan which it believes to be just and reasonable.

Two additional motions are also pending before the court. The first is "Interveners' Motion to Certify Questions of Law to the Kansas Supreme Court Pursuant to Kansas Statute 60–3201" (Doc. 110), which the court denies below. The second is "Plaintiff Turman's Motion to Strike Pleadings" (Doc. 112), which asks the court to strike three of the interveners' pleadings: (1) "Interveners' Total Costs Statement and Professional Legal Services Activity and Time Statement" (Doc 108), (2) "Interveners' Objection to Plaintiff's Costs and Attorney Fee Statement" (Doc. 107), and (3) "Interveners' Motion to Certify Questions of Law to the Kansas Supreme Court Pursuant to Kansas Statute 60–3201" (Doc. 110). As discussed below, plaintiff Turman's motion to strike is denied as to Document 107, and is moot as to Documents 108 and 110.

### ● Legal Standards

A federal court sitting in diversity must apply the substantive law of the state in which it sits, in this instance, the state of Kansas. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The method of distributing the amount recovered in a wrongful death action "depends upon the law of the state which, by its wrongful

death statute, creates the cause of action." *Kent v. Kansas Power and Light Co.,* 123 F.Supp. 662, 664 (D.Kan.1954). The parties agree that "[t]his wrongful death claim was brought pursuant to the Kansas Wrongful Death Act (K.S.A. §§ 60–1901 et seq.)." (Doc. 37 at 2); (Doc. 89 at 2). Section 60–1905 of the Act, which governs distribution of proceeds recovered in wrongful death actions, states as follows:

> The net amount recovered in any such action, after the allowance by the judge of costs and reasonable attorneys fees to the attorneys for the plaintiffs, in accordance with the services performed by each if there be more than one, shall be apportioned by the judge upon a hearing, with reasonable notice to all of the known heirs having an interest therein, such notice to be given in such manner as the judge shall direct. The apportionment shall be in proportion to the loss sustained by each of the heirs, and all heirs known to have sustained a loss shall share in such apportionment regardless of whether they joined or intervened in the action; but in the absence of fraud, no person who failed to join or intervene in the action may claim any error in such apportionment after the order shall have been entered and the funds distributed pursuant thereto.

The court will address the distribution issues currently pending in the order in which they are presented in § 60–1905.

## ● Attorneys Fees and Costs

Section 60–1905 provides that before apportioning the wrongful death proceeds the court may deduct "costs and reasonable attorneys fees to the attorneys for the plaintiffs, in accordance with the services performed by each if there be more than one."

## ● Attorneys Fees

■ The parties adopt fundamentally different interpretations of how the language of § 60–1905 should govern the apportionment of attorneys fees in this case.

Plaintiff argues that her attorney, Alan Higbie, should receive one-third of the gross settlement amount in accordance with the contingency fee agreement which she entered into with his law firm. She contends that such a fee is reasonable because the "recovery of the wrongful death proceeds in this case was accomplished through the sole efforts of [Mr. Higbie]." As counsel for the interveners, Michael Walker, took no active role in procuring the settlement, plaintiff asserts, he should be awarded no fee out of the gross proceeds. The interveners, on the other hand, move the court to first apportion the proceeds between the three heirs, and then "award attorneys fees based upon each party's respective contingent fee percentage applied to that party's apportionment pursuant to the respective Attorney–Client Fee Agreements." The interveners assert that distributing attorneys fees in such a manner is necessary to ensure that they "pay only those attorney fees that they agreed to with their respective attorney," and not the additional attorney fees of Mr. Higbie, who does not represent them.

The court agrees with plaintiff. The language of K.S.A. § 60–1905 contemplates awarding a fee out of the gross settlement proceeds for the services performed to create the fund. It does not contemplate paying a fee out of the gross proceeds to counsel for interveners whose only services rendered in the action are at the apportionment stage. Moreover, the court rejects the interveners' argument that it is inappropriate to have their share charged with a percentage of fees which would be payable to plaintiff's counsel.

The Kansas Court of Appeals has held that in determining "reasonable attorneys fees" under K.S.A. § 60–1905, the trial court must consider the factors set out in Rule 1.5(a) of the Model Rules of Professional Conduct. *See Baugh v. Baugh,* 25 Kan.App.2d 871, 973 P.2d 202 (1999). In considering the Rule 1.5(a) factors, the court finds Mr. Higbie's request for one-

third of the gross proceeds reasonable. First, the settlement agreement was the fruit of the efforts exerted solely by Mr. Higbie, a trial lawyer with over 25 years of experience. The court finds no merit in the interveners' argument that Mr. Higbie effectively shut them out of the settlement negotiations, thus breaching a fiduciary duty owed to them,[1] by rebuffing Mr. Walker's offers to enter into a comprehensive work agreement for the prosecution of the case. Mr. Higbie was under no obligation to enter into such an agreement, as the Kansas Wrongful Death Act permits any heir of the deceased to commence a wrongful death cause of action without regard to whether any other heir joins or intervenes therein. K.S.A. § 60–1902. If the interveners desired an active role in the settlement negotiations of the suit, they should have exercised their right to intervene at that stage in the litigation. *See* K.S.A. § 60–1902. As it turns out, the children did not move to intervene in this suit until after the settlement had been reached. Moreover, the interveners have presented no evidence that plaintiff or her attorney did not adequately represent the children's interests in the settlement negotiations and, indeed, they approved the settlement with no objection. *C.f. Jones v. Jones*, 301 Ark. 367, 784 S.W.2d 161, 163 (1990) (holding that attorney for surviving spouse was entitled to attorneys fees payed from the gross wrongful death recovery where the natural children voiced no objection to the attorney's representation of their interests).

■ Second, Mr. Higbie's one-third contingency fee as applied to the gross proceeds obtained is reasonable because it compensates Mr. Higbie for accepting the risks and responsibilities of prosecuting this complicated case. In order to accomplish a fair settlement agreement, Mr. Higbie was required to address the issue of accident reconstruction (he dispatched an accident reconstruction specialist to the accident scene while physical evidence of the crash was still available), as well as statute of limitations, bankruptcy, and workers compensation subrogation issues.

Third, in the experience of this court a one-third contingency fee is not uncommon in wrongful death actions, and such a fee appears to be supported by Mr. Higbie's experience in the field of motor vehicle litigation. Mr. Higbie has extensive trial experience and has authored a chapter in the Colorado Auto Litigator's Handbook.

■ Finally, the reasonableness of awarding Mr. Higbie one-third of the settlement proceeds is not diminished by the fact that the interveners were not a party to Mr. Higbie's contingency fee agreement. Because the interveners were not parties to the litigation at the time of the settlement negotiation, despite their interest in its outcome, they were not necessary contractual parties.[2] *See Vollmar v. Rup-*

1. The interveners seem to believe that Mr. Higbie owes them a fiduciary duty because the contingency fee contract entered into by plaintiff and Mr. Higbie states that plaintiff "retains [Mr. Higbie] to represent her and other wrongful death claimants." This contractual language likely stems from the requirement in K.S.A. § 60–1902 that any action brought under the statute must be for the "benefit of all of the heirs who has (sic) sustained a loss regardless of whether they all join or intervene therein." All parties agree, however, that the language in the contingency fee agreement does not create an attorney-client relationship between Mr. Higbie and the interveners. *See infra* note 2 and accompanying text. Assuming arguendo that the agreement nonetheless created a fiduciary

duty in Mr. Higbie to protect the interests of the interveners in the settlement conference, the court finds below that the interveners have presented no evidence that Mr. Higbie breached this duty.

2. As the interveners point out, Kansas Rules of Professional Conduct 1.7 and 1.8(g) prohibit Mr. Higbie from representing the interveners in this suit. Rules 1.7 and 1.8(g) govern situations involving lawyers who have two clients with conflicting interests. These rules have no application to the present issues before the court, however, because plaintiff, the interveners, and the court all agree that the interveners are not clients of Mr. Higbie. *Contrast Baugh*, 25 Kan.App.2d 871, 973 P.2d 202 (analyzing the effect of Kansas Rules of

*right*, 517 N.E.2d 1240, 1243 (Ind.Ct.App. 1988) (decedent's son, who was not a party to the wrongful death action, was not required to be a contractual party to contingency fee contract entered into by decedent's surviving spouse in order for court to award attorneys fees). As the interveners clearly benefitted from Mr. Higbie's services, the court does not find it unfair that the settlement amount is decreased by compensating Mr. Higbie before distributing a portion of the amount to the interveners. *See Baugh*, 973 P.2d at 207 ("[K.S.A. § 60–1905] clearly contemplates that fees for plaintiff's counsel will be awarded out of the recovery obtained," despite the financial "interests of the minor child.").

In sharp contrast to the time, skill, risk and responsibility expended by Mr. Higbie in securing the settlement is Mr. Walker's complete lack of involvement in this litigation until its very end.[3] In fact, Mr. Walker did not enter an appearance in this action until after the settlement agreement was presented to the court for approval. Because Mr. Walker performed no services to advance the settlement of the wrongful death action, the court cannot reasonably allocate any of the gross settlement proceeds towards his attorneys fees. *See Baugh*, 973 P.2d at 207 (holding that in allocating attorneys fees under K.S.A. § 60–1905, the court should apply the general rule that an attorney is entitled to the reasonable value of the services he performs); *Garrett v. McRee*, 201 F.2d 250, 252–53 (10th Cir.1953) (holding that trial court had "equitable jurisdiction" to aggregate amount of attorneys fees awarded based on its knowledge of the services performed by each attorney in creating the beneficiary fund under the Oklahoma Wrongful Death Act); *Weavel v. United States Fidelity & Guaranty Co.*, 848 P.2d

54, 61 (Okla.App.1993) (holding that attorneys fees earned by representing heirs at apportionment hearing may not be charged "against the predistribution total recovery"). Thus, the court limits the attorneys fees paid out of the gross proceeds to those which compensate Mr. Higbie for the services he performed in obtaining the settlement amount. The interveners' motion for attorneys fees (Doc. 80) is denied.

In light of the court's order above, the court denies the interveners' motion to certify questions regarding attorneys fees paid under the Kansas Wrongful Death Act to the Kansas Supreme Court (Doc. 110). First, the interveners request that the court certify questions if it decides that *Baugh v. Baugh*, 25 Kan.App.2d 871, 973 P.2d 202 (1999) "does not apply to this case," or if it decides to disregard the contingent fee agreements entered into by the parties with their attorneys. Above, the court has applied *Baugh* and has upheld the contingent fee contracts. Second, as asserted by plaintiff in her motion to strike pleadings (Doc. 112), the interveners' October 10, 2000 motion to certify is clearly beyond the scope of the pleadings which the court authorized the parties to file following the September 21, 2000 telephone conference. Decedent's heirs have waited over five months for the settlement proceeds to be apportioned, and the court will not delay the apportionment further. In the court's experience, certifying questions to the Kansas Supreme Court extends the resolution of cases by as much as one year. Finally, the interveners' motion is denied because it relies largely on Kansas Rules of Professional Conduct 1.7 and 1.8(g), which the court has found inapplicable to the questions presently at issue. In light of this finding, plaintiff's motion to strike pleadings (Doc. 112) becomes moot to the extent that it seeks to strike the

Professional Conduct 1.7 and 1.8(g) where potential beneficiaries retained the same law firm to represent them in wrongful death action).

3. The court is aware that Mr. Walker has performed services for the interveners not related to the instant federal suit, such as providing representation at the administrative workers compensation hearing, for which it assumes he has been compensated.

interveners' request to certify questions to the Kansas Supreme Court.

### ● Costs

■ Both plaintiff and the interveners have filed separate motions seeking reimbursement for the costs incurred by their attorneys in prosecuting this case. Under the above analysis, the court finds it appropriate to reimburse Mr. Higbie, whose work produced the settlement fund, for his costs expended in that effort. Like attorneys fees, however, K.S.A. § 60–1905 does not contemplate the reimbursement of costs incurred during the apportionment phase of a settlement proceeding. As Mr. Walker did not incur costs to create the settlement fund, the interveners' motion for costs (Doc. 80) is denied.[4]

While the court finds it appropriate to award plaintiff costs incurred in reaching the settlement, it is prevented at this juncture from entering judgment as to the specific amount of costs awarded. Plaintiff (or, more appropriately, plaintiff's attorney) has submitted an itemized expense report totaling costs at $20,212.65 (Doc. 83). However, the interveners have objected on three grounds to plaintiff's cost statement: (1) plaintiff's inclusion of co-counsel attorney fees as costs, (2) plaintiff's inclusion of the fee paid for "certain investigations that, upon information and belief, have no relevance to this legal matter," and (3) the "mark up" by plaintiff's attorney of costs relating to certain office expenses and mileage (Doc. 107). Rather than respond to the interveners' objection, plaintiff filed a motion to strike it, asserting that it is beyond the scope of the pleadings that the court authorized the parties to file following the September 21, 2000 telephone conference.

The court recognizes that its Order arising out of the September 21, 2000 telephone conference (Doc. 98) did not specifically allow the interveners to file an objection to plaintiff's cost statement. However, the court believes that it must consider such a pleading in order to arrive at a fair division of the settlement proceeds. Therefore, to the extent that plaintiff's motion to strike pleadings (Doc. 112) seeks to strike the interveners' objection to plaintiff's cost statement, it is denied. Plaintiff is ordered to file a response to the objection by December 11, 2000. Shortly thereafter, the court will issue a final determination on the reasonable costs to be awarded. In the meantime, the court will set forth a general apportionment formula below.

### ● Allocation and Apportionment

K.S.A. § 60–1905 states that after the court deducts attorneys fees and costs from the gross amount recovered in a wrongful death action it shall apportion the net proceeds "in proportion to the loss sustained by each of the heirs." When apportioning the proceeds, however, the court must be mindful that "damages, other than pecuniary loss sustained by an heir at law, cannot exceed in the aggregate the sum of $250,000." K.S.A. § 60–1903(a). In other words, the court may not allocate more than $250,000 of the net settlement recovery to nonpecuniary damages.

### ● Allocation and Apportionment of Non–Pecuniary Damages

Following Charles W. Turman's death, each of his heirs was paid workers compensation death benefits in accordance with Colorado law. Due to a statutory right of subrogation in the workers compensation insurer, the heirs will be required to use the wrongful death proceeds apportioned to them to reimburse the insurer for some of the death benefits. *See* C.R.S. § 8–41–203. The compensation insurer is only subrogated, however, to each

---

4. Because the court has denied the interveners' motion for costs, the court need not examine the intervener's itemized statement of costs (Doc. 108). Thus, plaintiff's motion to strike pleadings (Doc. 112), to the extent that it seeks to strike the intervener's cost statement, is moot.

heir's right to economic recovery on the wrongful death claim (pecuniary damages), and is not subrogated as to the heir's right to recover non-economic amounts (non-pecuniary damages).[5] *See Colorado Compensation Ins. Authority v. Jorgensen*, 992 P.2d 1156 (Colo.2000). For this reason, the parties request that the court allocate the maximum amount allowed by K.S.A. § 60–1903(a), $250,000, to their non-pecuniary losses.[6]

■ The court finds that $250,000 is an appropriate amount to compensate the heirs for their nonpecuniary losses, and therefore grants the parties' request. "Nonpecuniary damages generally are intangible in nature such as mental anguish, bereavement, loss of society, and loss of companionship." *McCart v. Muir*, 230 Kan. 618, 641 P.2d 384, 391 (1982). The Kansas Supreme Court has recognized that "while these [intangible damages] are nebulous and impossible to equate satisfactorily with money, they nonetheless are very real and onerous to a bereaved [family member], often far outweighing in severity and permanent effect the pecuniary loss involved." *Corman v. WEG Dial Tel., Inc.*, 194 Kan. 783, 402 P.2d 112, 115 (1965).

Each of the three heirs have presented evidence that convinces the court that their intangible damages are significant.

First, plaintiff has presented evidence that she has suffered great mental anguish and grief since the death of her husband. A letter written by plaintiff's friend, Carlene Wright, describes the shock plaintiff felt immediately after being notified of her husband's death. Upon receiving the notification, plaintiff drove from her home in Colorado to the accident site in Kansas because she could not believe that her husband was actually dead. Wright Letter at 1. When she returned from the trip, plaintiff was "devastated and hardly could even cope with reality." *Id.* Plaintiff was in so much pain that she contemplated suicide and then "became a zombie with tears." *Id.* Further evidence of plaintiff's bereaved state is presented in a letter from another of plaintiff's friends, Mellany van der Boon. Ms. van der Boon wrote that on around May 15, 1997, plaintiff arrived unexpectedly at her house. van der Boon Letter at 2. Plaintiff was in shock over the death of her husband and cried continuously. *Id.* Even several months after his death, plaintiff would cry when she spoke of decedent and seldom left her house. *Id.* Finally, plaintiff herself testified at the July 5, 2000 court hearing that she was forced to seek medical care approximately three weeks after her husband's death because she suffered from great anxiety, could not sleep, and "just couldn't function." [7] Transcript of July 5,

---

5. The compensation insurer is also required to give credit to the beneficiaries for the proportional amount paid by each for attorneys fees and costs incurred in creating the settlement or other recovery. *See County Workers Compensation Pool v. Davis*, 817 P.2d 521 (Colo.1991).

6. The court need not calculate the exact amount due the workers compensation insurer, which would require knowledge of the current amount of death benefits paid each heir. The insurer has agreed to be bound by the court's allocation between pecuniary and nonpecuniary damages and has chosen not to intervene in this action.

7. The interveners ask the court to consider, as it makes its apportionment determinations, what they call plaintiff's "lack of candor." The interveners suggest that two statements

made by plaintiff during her testimony at the July 5, 2000 hearing are perjurious.

The first statement involves plaintiff's testimony that her doctor had diagnosed her with memory loss following the death of her husband. After examining the transcript of the hearing and viewing this statement in context, however, the court finds that plaintiff clarified her statement, such that her ultimate testimony was that she had discussed memory loss with her physician, but that she does "not know" if a diagnosis of memory loss is in her "medical file." Transcript of July 5, 2000 Hearing at 28. This testimony is not inconsistent with her later Answer to Interveners' Interrogatories, stating that she has not been diagnosed as having memory loss.

The second statement involves plaintiff's testimony that she and her husband had never separated. As discussed below at page 19,

2000 Hearing at 29. According to plaintiff, the grief which she felt after decedent's death "seemed to be never-ending." Plaintiff's Answers to Interveners' Interrogatories at 5. The court finds that this evidence demonstrates the great loss plaintiff has suffered, and will continue to suffer, after losing the society and companionship of her husband. Plaintiff and decedent had lived together for approximately 11 years before his death. Transcript of July 5, 2000 Hearing at 6. Although decedent traveled frequently for work, he called plaintiff twice a day during the times when he was away. *Id.* at 27. Plaintiff deserves to be compensated for her pain and for the loss of the relationship that she shared with her husband.

Second, intervener Charles J. ("C.J.") Turman presented evidence that he will suffer greatly from losing his father's society and companionship. He testified at his deposition that his father was his "best friend." Charles J. Turman Depo at 6. C.J. explained his relationship with his father as follows: "Every time I was able to spend time with him, it was just beyond words.... We liked to go cat fishing a lot, especially when I was younger.... I loved spending time with him and he loved spending time with me, we enjoyed it when we were together." *Id.* C.J.'s friend, Garrett Walden, offered corroborating testimony about C.J.'s feelings towards his father, stating that the two were very close and that "C.J. was always excited and happy about being with or doing something with his Dad." Walden Aff. at 1. Deborah Turman, the interveners' mother, also testified that her children "loved and worshiped Charles and were very close to their Dad and visited often." Deborah Turman Aff. at 2. In addition to living with his father during most summers, C.J. lived with him during his freshman year in high school. When the two lived apart, they talked on the telephone as often as their schedules would allow—sometimes more

than once per week, but sometimes once per every two weeks. Charles J. Turman Depo. at 18–19. Before his death, decedent had moved to Colorado so that he and his children could spend more time together. *Id.* at 11. Decedent's death takes that opportunity away from C.J. While, as C.J. stated at his deposition, no amount of money can compensate for the loss of one's father, *id.* at 12, the court nonetheless awards C.J. nonpecuniary damages in light of this intangible loss.

Finally, intervener Chanda Turman demonstrated that she too has suffered significant non-economic injuries from the loss of her father. Like her brother, Chanda spent most summers with decedent and enjoyed his company. Chanda Turman Depo. at 4–6; Deborah Turman Aff. at 2. Near the end of his life, Chanda had grown closer to her father, visiting him for a week in Colorado Springs. Chanda Turman Depo. at 4, 6. Decedent's untimely death has deprived Chanda of the chance to further cultivate her relationship with him. When responding at her deposition to the question of what her fondest memory of her father was, Chanda's obvious sadness convinced the court that Chanda is still mourning the loss of her father, even three years after his death. *Id.* at 17. Chanda misses what she believed to be her father's unconditional love for her. *Id.* at 18. Like plaintiff and C.J., Chanda is entitled to an award of nonpecuniary damages.

While each of the three beneficiaries has suffered intangible losses unique to him or her, the court does not find that any one beneficiaries' losses can be valued greater than the losses of another. All have suffered significantly. Thus, the court orders the maximum statutory amount of nonpecuniary damages, $250,000, subject to the deduction of attorneys fees, to be apportioned equally among the heirs.

the court has considered the significant amount of evidence presented on this issue of

separation, but ultimately finds the issue to be of little relevance.

● **Apportionment of Pecuniary Damages**

The court must apportion the remainder of the settlement amount based on the pecuniary damages suffered by each of the decedent's heirs. *See* K.S.A 60–1905. In *McCart,* the Kansas Supreme Court defined pecuniary damages as follows:

> Pecuniary damages are such as can be estimated in and compensated by money. Pecuniary loss or damages in a wrongful death case should be equivalent to those pecuniary benefits or compensation that reasonably could have resulted from the continued life of the deceased.

641 P.2d at 391 (internal quotations and citations omitted). Pecuniary damages include losses of such things as marital or parental care, services, training, advice, and financial support. *See Wentling v. Medical Anesthesia Services, P.A.,* 237 Kan. 503, 701 P.2d 939, 947–48 (1985); *Griffith v. Mt. Carmel Medical Center,* 842 F.Supp. 1359, 1366–67 (D.Kan.1994). To support a claim for pecuniary damages in a wrongful death action, an heir need not prove his or her loss with mathematical certainty; rather, the heir need only show the nature and extent of the loss asserted. *Wentling,* 701 P.2d at 948.

The parties disagree about the percentage of the remaining proceeds that should be awarded to each heir as pecuniary damages. Plaintiff suggests that an apportionment of 15% to each intervener and 70% to plaintiff is a fair distribution. The interveners suggest that a more equitable distribution would give 40% of the remaining proceeds to each intervener and 20% to plaintiff. After considering the limited evidence presented by the parties of losses pecuniary in nature, however, the court ultimately determines that the remainder of the settlement award should be apportioned 50% to plaintiff and 25% to each intervener.

The court reaches its apportionment decision by examining the factors commonly viewed by Kansas courts as pecuniary in nature. *See Kolles v. Ross,* 418 N.W.2d 733, 736–37 (Minn.Ct.App.1988) (considering factors of pecuniary loss in apportioning award of settlement in equal shares to wife of 36 days and children who had received child support). Perhaps the most tangible factor considered by Kansas courts, and addressed most prominently by the parties here, is the loss of financial support that the parties reasonably could have expected to have received from the continued life of the deceased. At the July 5, 2000 court hearing, plaintiff presented an Economic Appraisal of Loss Report prepared by an expert economist. Pls. Exh. 1. After deducting for decedent's personal consumption, the report values decedent's past (from the time of his death to the time the report was prepared) and future earnings at $696,800. The court is convinced that the far greater part of these earnings would have benefitted plaintiff, rather than either of the interveners. The interveners themselves admit that their father paid essentially no child support during his lifetime. Charles J. Turman Depo. at 9; Chanda Turman Aff. at 1; Deborah Turman Aff. at 1. Decedent even moved from state to state in an effort to avoid making such support payments. Charles J. Turman Aff. at 2. The court recognizes that decedent did financially support his children when they lived with him–during approximately two months of most years and, as to C.J. Turman, during an eight month span during the 1995/1996 school year. Charles J. Turman Depo. at 6, 9; Chanda Turman Depo. at 4, 5; Transcript of July 5, 2000 Hearing at 35. Decedent also gave his children Christmas and birthday gifts yearly, and a large gift of furniture near the end of his life. Charles J. Turman Depo. at 11, 18; Exh. K, Doc. 89. This limited support would have likely continued past the interveners' minority. *See Laterra v. Treaster,* 17 Kan. App.2d 714, 844 P.2d 724, 727 (1992) ("There appears to be no valid reason why a child should be limited to loss of financial

support a deceased parent would have provided during the child's minority, rather than the support the child could have reasonably expected to receive during his entire lifetime."). The amount and type of support decedent would have likely continued to give each of his children, however, pales in comparison to the financial support plaintiff could have expected to have received from decedent's continued life.

█ The evidence shows that plaintiff relied on decedent to support herself and her two sons. Deborah Turman Aff. at 1; Charles J. Turman Aff. at 2. Plaintiff was often unemployed during her marriage to decedent. Deborah Turman Aff. at 2. The couple shared a joint bank account and incurred joint liability on such things as a car loan and apartment leases. Transcript of July 5, 2000 Hearing at 47; Exhs. 9–14, Doc. 74. While the interveners have presented evidence that plaintiff and decedent separated on at least one occasion in late 1995, and even that they were separated at the time of decedent's death, the court simply gives this evidence little weight in determining plaintiff's pecuniary damages from the loss of decedent's financial support. Charles J. Turman Depo. at 7–8; Douglas Aff. at 1, 2; Deborah Turman Aff. at 2. First, plaintiff has explained that in late 1995, she and her two children moved to a trailer for a couple of weeks because she and her husband had jointly decided that they needed to remove plaintiff's two sons from C.J.'s influence. Shelly Turman Aff. at 3; van der Boon Letter at 1; Plaintiff's Answers to Interveners' Interrogatories. Plaintiff contends that she and her husband were not separated at the time of his death, and that they had made future plans together. Transcript of July 5, 2000 Hearing at 47; Shelly Turman Aff. at 3; Wright Letter at 1. Second, even if the two were separated at the time of decedent's death, this does not convince the court that plaintiff would not have received continued

financial support from decedent. There is no indication that the alleged separation would have led to a divorce, particularly in light of the fact that past alleged separations did not end in divorce. Moreover, even if a divorce did result, one could reasonably anticipate that plaintiff would have received support payments as part of a divorce settlement or judgment. The court must rest its decision on facts that are known. Based on the uncontroverted evidence, the court can be sure that, during his lifetime, decedent provided much more financial support to his wife than to his two children. Although the court does not present itself as a prophet who can foresee what "would have been" had decedent lived, as the necessary finder of fact in this case the court holds that decedent's long-established pattern of supporting his wife more than his children most probably would have continued.

A second type of pecuniary loss is loss that results from the discontinuation of the decedent's services to his heirs. Plaintiff has testified that, while alive, decedent performed household chores, such as washing windows, gardening, cooking, and fixing broken items at the house. Transcript of July 5, 2000 Hearing at 33; Spears Letter at 1. The Economic Appraisal of Loss Report valued the loss of decedent's "time contribution for household responsibilities and activities, [including] such chores as yard work, car maintenance, [and] house maintenance," at $182,000.[8] Because plaintiff shared the same household as decedent much more frequently than did the interveners, the court finds that most of decedent's services benefitted her. The interveners have presented very little evidence of services which decedent performed for them. C.J. testified that when he lived with his father during the 1995/1996 school year, his father helped him with his homework, but he also stated that his father did not

---

8. This estimated amount of loss assumes that plaintiff and decedent would have remained married. As discussed above, the court has ruled that, based on the evidence presented, the court will not assume a different, more speculative, alternative.

attend parent-teacher conferences during that year. Charles J. Turman Depo. at 17. The court finds that plaintiff has suffered much more significantly from the loss of decedent's services than have the interveners.

The remaining three types of pecuniary losses discussed by the Kansas courts are loss of marital or parental care, loss of training, and loss of advice. Based on the similar nature of these factors and the parties' failure to distinguish between them in their presentation of evidence and argument, the court will examine the remaining factors together. The court initially notes that it has considered the heirs' loss of decedent's society and companionship, which is easily confused with the factors considered here, in apportioning nonpecuniary damages above. The parties have submitted relatively little evidence of loss of marital or parental care, training, or advice. Plaintiff has submitted holiday cards bearing endearing messages written by decedent, including an Easter card which she received only one month before his death, and the court considers this evidence of the support and care frequently given between spouses. Exh. 24, Doc. 74. The court also finds that plaintiff suffers from asthma and back problems, conditions which she could have expected decedent to help her care for in the future. Charles J. Turman Depo. at 28–29. The interveners presented evidence (including plaintiff's testimony) that decedent had moved to Colorado shortly before his death in order to "be there" for his children as they "finished growing up." *Id.* at 11; Transcript of July 5, 2000 Hearing at 46. Chanda stated at her deposition that, near the time of his death, decedent was "trying to make an effort to take care of me and my brother." Chanda Turman Depo. at 6. The court finds that this evidence demonstrates that the interveners have suffered from the loss of future parental care and advice that their father would have given them.

While each heir has suffered some amount of pecuniary loss from decedent's death, it is clear that plaintiff has suffered to a disproportionately greater extent-at least as to the loss of financial support and services. For this reason, the court orders the remaining settlement proceeds distributed as follows: 50% to plaintiff, 25% to C.J. Turman, and 25% to Chanda Turman.

### ● Conclusion

In an attempt to bring the wrongful death portion of this case closer to an ultimate resolution, the court has set forth the following formula for distributing the settlement proceeds. First, Mr. Higbie's costs incurred in reaching the settlement will be subtracted from the settlement amount. Next, $250,000 of the proceeds will be allocated as nonpecuniary damages. This amount will be equally distributed among the three heirs after one-third is apportioned to Mr. Higbie for attorneys fees. Then, the amount remaining will be allocated as pecuniary damages. After one-third of this amount is apportioned to Mr. Higbie for attorneys fees, plaintiff will be awarded one-half of any net amount, and each intervener will be awarded one-fourth of any net amount. Such is the formula which the court will apply when distributing the settlement proceeds after resolving the remaining issues related to plaintiff's request for costs.

IT IS ACCORDINGLY ORDERED BY THE COURT that plaintiff's Motion for Approval of Settlement (Doc. 37) is granted as to the issues of attorneys fees and allocation between pecuniary and nonpecuniary damages, denied as to the issue of apportionment, and retained under advisement as to the issue of costs. Interveners' Motion for Apportionment Among the Heirs (Doc. 78) is denied. Interveners' Motion for Approval of Attorney Fees and Costs (Doc. 80) is denied. Interveners' Motion Regarding Workers Compensation and Subrogation (Doc. 82) is granted.

IT IS FURTHER ORDERED that Interveners' Motion to Certify Questions of

Law to the Kansas Supreme Court Pursuant to Kansas Statute 60–3201 (Doc. 110) is denied. Plaintiff Turman's Motion to Strike Pleadings (Doc. 112) is denied as to Interveners' Objection to Plaintiff's Costs and Attorney Fee Statement (Doc. 107), and is moot as to Interveners' Total Costs Statement and Professional Legal Services Activity and Time Statement (Doc 108) and Interveners' Motion to Certify Questions of Law to the Kansas Supreme Court Pursuant to Kansas Statute 60–3201 (Doc. 110). Plaintiff is ordered to file a response to Document 107 by December 11, 2000.

IT IS SO ORDERED.