Vicki NEWTON, Plaintiff,

and

Robert Christopher Newton,
Intervenor Plaintiff,

v.

AMHOF TRUCKING, INC.,
et al., Defendants.

No. 02–2321–JPO.

United States District Court,
D. Kansas.

May 21, 2004.

Douglas K. Rush, Thomas Lightner Bell, C. Marshall Friedman, P.C., Patrick S. O'Brien, Rathmann & O'Brien, LLC, St. Louis, MO, Stephen G. Dickerson, The Katz Law Firm, Olathe, KS, for Plaintiff.

David E. Larson, Jimmy E. Allen, Jr., Larson & Larson, P.C., Leawood, KS, for Intervenor Plaintiff.

Jeffrey C. Baker, Roger W. Warren, Sanders Conkright & Warren LLP, Overland Park, KS, James L. Baker, Merrick Baker & Strauss, PC, Kansas City, MO, Leo L. Logan, William P. Coates, Jr., Coates & Logan, LLC, Overland Park, KS, for Defendants.

### MEMORANDUM AND ORDER

O'HARA, United States Magistrate Judge.

#### I. Introduction and Background.

The plaintiff, Vicki Newton ("Vicki"), filed this suit under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq., and under Kansas law, to recover damages on account of the death of her husband, Robert Edward Lee Newton ("Bob"), in a motor vehicle accident on July 30, 2001. The vehicle Bob was operating for his employer, defendant Burlington Northern and Santa Fe Railway Company ("BNSF"), was struck from behind on Interstate Highway 35, near Beto Junction, Kansas, by a truck driven by defendant John Frantzen ("Frantzen"), who was employed by and working on behalf of defendant Amhof Trucking, Inc. ("Amhof"). Amhof and Frantzen are insured by defendant Fireman's Fund Insurance Company ("Fireman's Fund") (Amhof, Frantzen, and Fireman's Fund are collectively referred to in this memorandum and order as the "Amhof defendants").

Vicki brought the FELA claim in her capacity as Bob's surviving spouse. She brought the Kansas wrongful death action as Bob's surviving spouse and heir-at-law under Kan. Stat. Ann. § 60–1902, and as statutory agent for all of Bob's heirs who sustained a loss by reason of his death. See K.S.A. 60–1901 et seq. In addition to the FELA and Kansas wrongful death claims, Vicki asserted a survival cause of action as the special administratrix of Bob's probate estate, in order to recover for any conscious pain and suffering by Bob after he was injured and before he died. See Kan. Stat. Ann. §§ 60–1801 & 1802.

Vicki filed this suit on July 8, 2002. On October 6, 2003, after most pretrial discovery had been completed by Vicki, BNSF, and the Amhof defendants, the court granted Bob's adult son, Robert Christopher Newton ("Chris"), leave to intervene as an additional plaintiff pursuant to Fed. R.Civ.P. 24. The court, however, limited the intervention to the Kansas wrongful death and survival actions, ruling as a matter of law that Chris had no interest in the FELA claim (doc. 113). It is uncontroverted that Chris and Vicki are the only heirs-at-law for purposes of the wrongful death claim under Kansas law.

Although BNSF and the Amhof defendants initially denied and, indeed, continue to deny any liability for any of the various causes of action pleaded in this case, the parties have compromised and reached proposed settlements of all claims asserted by Vicki and Chris. The total amount of the proposed settlement is $1,125,000. BNSF has agreed to pay $750,000 to settle the FELA claim, and the Amhof defendants have agreed to pay $375,000 to settle the state law claims. Further, BNSF and the Amhof defendants have settled their property damage cross-claims, although the specific terms of that aspect of the parties' comprehensive settlement have not been provided to the court.

On April 20, 2004, the court held a hearing to apportion the total settlement proceeds of $1,125,000, as requested in Vicki's motion (**doc. 143**), which the court hereby grants. No court approval is necessary with regard to settlement of the cross-claims. The parties' proposed settlement of the claims asserted by Vicki and Chris is approved, i.e., both the gross amount and the amounts to be contributed by BNSF and the Amhof defendants.

The court heard evidence and arguments at the April 20, 2004 hearing regarding apportionment as to the FELA claim, as to the recovery for Bob's wrongful death to those heirs-at-law who proved entitlement to the proceeds, and to approve attorneys' fees and litigation expenses for Vicki's counsel. Despite the earlier pleaded survival action, the parties stipulated at the hearing that there is no evidence that Bob consciously suffered after the subject motor vehicle collision, and thus further stipulated that the survival action must be dismissed, with prejudice.

Vicki appeared at the April 20, 2004 hearing in person and through her counsel, Douglas K. Rush and Stephen G. Dickerson. Chris appeared in person and through his counsel, David E. Larson and Jimmy E. Allen. The Amhof defendants appeared through counsel, Jeffrey C. Baker. BNSF, though duly notified of the hearing, did not appear; counsel for BNSF had previously advised the court that he probably would decline to attend, as BNSF takes no position on how any of the settlement proceeds should be apportioned between Vicki and Chris.

The court has considered the parties' evidence and arguments, and is now prepared to issue its findings of fact and conclusions of law. Before doing so, however, it should be noted that a basic problem with this case—like most multiparty cases involving wrongful death claims and disputed issues of liability and apportionment of fault—is that there simply is not enough settlement money available to please everyone. Unfortunately, no amount of cold hard cash can adequately compensate Vicki or Chris for Bob's death.

With all due respect to the parties and their excellent attorneys, the court also feels compelled to note that Vicki and Chris have staked out completely untenable legal positions. That is, while Vicki ultimately conceded during her testimony that Chris suffered non-pecuniary loss as a result of Bob's death, she continues to maintain that *all* of the $1,125,000 in settlement funds should be awarded to her, and that Chris should receive *nothing*. Chris' pre-hearing pleadings contained the totally unsupported hypothesis that Vicki's recovery should be reduced because it was only "through happenstance" that Vicki and Bob even were married at the time of his death. *See* doc. 168, p. 2. Also, Chris continued to argue at the hearing that the non-pecuniary damages assessed in this case should be equally divided between Vicki and Chris, even though the evidence at the hearing was essentially undisputed that Chris' military career path has been such that he only saw his father occasionally, while Vicki saw Bob almost daily.

And finally, Chris argued that any share of the settlement fund awarded to him should not be burdened with a full pro rata share of the modest 25% contingency fee charged by Vicki's counsel, i.e., the same lawyers whose work produced the settlement fund. None of the above-described legal positions is reasonable. Although Vicki appears to be a good woman, her legal position seems cold and mean-spirited, if not outright greedy. Chris also seems like a good man, but his legal position is inconsistent with the facts presented and common sense.

As stated on the record at the close of the hearing, the undersigned magistrate judge is firmly convinced that Vicki and Chris, who purport to enjoy a reasonably close and cordial personal relationship, should have been able to fashion a reasonable apportionment settlement by themselves. The court is genuinely disappointed that they have failed to do so. However, given that the court now has been called upon to apportion the settlement proceeds, the court will endeavor to be completely objective, with the ultimate goal of fashioning a distribution plan that is fair to both Vicki and Chris.

## II. Findings of Fact.

### A. The Parties' Relationships

Bob divorced Chris's mother in 1974, when Chris was only two years old. After the divorce, Chris moved with his mother to Little Rock, Arkansas.

Three years later, on August 12, 1977, Bob and Vicki married. At some point in 1996, Vicki and Bob divorced and lived separately for a period of about four weeks. After this very brief separation, however, Bob moved back in with Vicki. They lived together until Bob's death, but did not legally remarry until May 6, 2000, about one year before his death.

While Chris and his mother lived in Arkansas, Chris' contact with his father was limited to a six-week visit each summer and occasional trips to visit extended family. Each summer, Bob and Vicki would drive to Arkansas to pick up Chris and then drive back to Arkansas to return him at the end of the visitation period. These visits continued until Chris was twelve or thirteen years old, when Chris and his mother moved back to the Kansas City, Missouri area. After the move, according to Vicki, Chris did not regularly see Bob. That is, Vicki maintains that, even after Chris returned to Kansas City, his visits to Vicki and Bob's home never numbered more than two or three per year. However, Chris disputed this testimony, claiming that he visited his father every other weekend until he turned sixteen, at which time the visits did occur less frequently. The court finds Chris more credible than Vicki on this point.

Chris and his mother lived in the Kansas City area through Chris' graduation from high school in 1990. In 1992, Chris enlisted in the United States Navy. He later reenlisted, and continues in this nation's military service. Not surprisingly, at no time during Chris' service in the Navy has he been stationed in the Kansas City area.

Since Chris' enlistment in the Navy, Bob only visited Chris seven or eight times. Bob and Vicki attended Chris' graduation from basic training in 1992. In 1997, they visited Chris in Jacksonville, Florida, spent a week with him, and attended the Daytona 500 automotive race together. In 1998, when Bob and Vicki were en route to Mexico, they spent time with Chris at an airport in Dallas. In 1999, Vicki, Bob, and Chris met at Vicki's daughter's wedding. Later in 1999, after Bob had suffered a heart attack, Chris traveled to Kansas City and spent a week with his father. In 2001, Chris surprised Bob by traveling to Kansas City for Bob's fiftieth birthday celebration. Bob and Vicki traveled to Dallas in 2001 to attend Chris' Navy reenlistment ceremony. Finally, in 2001, Chris spent

time with Vicki and Bob when they all traveled to Arkansas for the funeral of Bob's mother.

In addition, Bob had planned to travel with Chris to Seattle, Washington, where Chris had been ordered to report for a new naval assignment. However, Bob's untimely death prevented that joint trip from taking place.

Written communications among Chris, Vicki, and Bob were largely limited to postcards sent by Chris from his various ports of call, and holiday greeting cards sent by Vicki to Chris. Much of the telephone communications between Bob and Chris—when planning the various trips, for example—actually were facilitated through Vicki, as Bob usually worked fifty to sixty hours per week.

### B. Financial Issues

The evidence is uncontroverted that Bob did not provide any financial support to Chris, aside from Christmas or birthday gifts and, on at least one occasion, airline tickets, after Chris turned eighteen.

At the time of Bob's death, he and Vicki jointly owned certain property, including a town home, a second home in which they lived together, and three automobiles. Since Bob's death, Vicki has sold one of the vehicles and both of the residential properties. Vicki testified that she did not know the sale prices of this property, except the home she and Bob shared, which was sold for $187,500.

Even though Bob was a full-time BNSF employee, he had begun operating a small trucking company shortly before his death. Vicki worked to some extent on the bookkeeping and billing side of this small business, and Bob maintained the two trucks. Bob also drove one of the trucks on weekend, over-the-road trips; the company employed another driver who drove during the week. Two weeks following Bob's death, the engine "blew" in the truck used for long-distance trips. According to Vicki, the trucking company ceased all operations at that point. Vicki sold the two trucks, which were apparently the company's only assets, in 2004.

Consistent with the fact that Chris was consistently away from Kansas City on naval duty, he never worked for or took on any responsibilities of the fledgling trucking company. Nor did Chris receive any financial benefit from the company. Chris testified that he and his father had had some very vague conversations about Bob's plans for retirement, and Bob's hope that the trucking company would be something he could pass on to his and Vicki's children or grandchildren. However, Chris candidly admitted that there was no definite agreement that he would ever work for the trucking company, which is not surprising since he plans to remain in active military service for at least eleven years and has not yet made any plans for his post-naval career.[1]

1. Before the apportionment hearing, Vicki filed a motion in limine to exclude any testimony of this nature on the basis that it was improper hearsay (doc. 170). The court took the motion under advisement at the beginning of the apportionment hearing. The court now concludes that, to the extent any of Chris' testimony involved hearsay, that hearsay evidence arguably was probative of Bob's state of mind, and is therefore arguably admissible under Fed.R.Evid. 803(3). The motion in limine therefore is denied. In any event, the court concludes that Chris's testimony regarding this issue, at most, shows only a very vague idea for the future, rather than any solid plan or financial expectation between Bob and Chris. Moreover, Chris' counsel candidly conceded at the end of the hearing that, given the state of the record, Chris did not really have any legal basis to state a claim for pecuniary loss, which this testimony was meant to support. Therefore, the court places little if any, weight on this testimony, as it is now essentially irrelevant.

Vicki received life insurance proceeds on account of Bob's death totaling slightly more than $150,000. To date, Chris has received nothing from Bob's estate. Vicki has borne the entirety of any costs incurred since Bob's death, except that Vicki asked Chris to pay for the engraving on Bob's headstone, to which Chris agreed.

Finally, with regard to Bob's contributions to household duties during his life, while Vicki was primarily responsible for all cleaning and laundry in the home, Bob handled all maintenance and a substantial remodeling project. Chris presented no evidence that he relied on Bob for any type of day-to-day assistance.

Dr. Michael P. Kelsay was retained by Vicki to perform an economic valuation of Bob's trucking business. Dr. Kelsay's curriculum vitae and his analysis were entered into evidence (Pl's. Exs. 2 & 5). Dr. Kelsay valued the trucking company at $62,570. No contrary evidence of the value of the company was presented. Chris' counsel, however, argued that the company could have continued in business if Vicki had chosen to fix the broken truck rather than sell the company's assets, and that continuation of the business would have ultimately resulted in a higher value.

Dr. Leroy J. Grossman was retained by Vicki to analyze the total economic loss suffered by Bob's family as a result of his death, based on Bob's wages and benefits. Dr. Grossman did not appear at the hearing, but his economic analysis (Pl's.Ex. 9), his curriculum vitae (Pl's.Ex. 8), the background information supporting his report (Pl's.Ex. 10), and his original deposition (Pl's.Ex. 7) were admitted into evidence. Dr. Grossman calculated the economic loss with Bob's work expectancy and life expectancy to be $772,687 assuming that Bob would have retired at age 62.9, and

$946,785 assuming that Bob would have retired at age 66. Chris did not present any contradictory expert evidence. Chris' counsel did point out that Dr. Grossman's analysis failed to include a reduction for personal consumption-that the analysis is an estimate of gross wage loss, rather than a net loss after personal consumption. Chris' counsel also attempted to introduce evidence of one type of consumption estimate, and suggested that the court should implement such an estimated reduction, but presented no expert testimony to support the argument that the proposed statistical consumption estimates were appropriate.[2] In any event, Dr. Grossman—the only expert who testified on this issue—testified that he never uses such statistical estimates, because personal consumption varies between families to the extent that no statistical model is appropriate in all cases.

### III. Conclusions of Law.

#### A. Attorneys' Fees and Expenses.

■ Kan. Stat. Ann. § 60–1905 provides that, before apportioning wrongful death proceeds, the court may deduct "costs and reasonable attorney fees to the attorneys for the plaintiffs, in accordance with the services performed by each if there be more than one." The court concludes that the 25% contingency fee charged by Vicki's counsel is reasonable. Indeed, that fee rate is lower than what often is charged in personal injury cases. Therefore, the court will reduce the plaintiffs' recovery in this lawsuit in order to pay that fee, which totals $281,250 (i.e., $1,125,000 × .25 = $281,250).

■ As earlier indicated, Chris requests that these attorneys' fees not be assessed against any money the court awards him

---

**2.** The court denied that portion of a motion (doc. 151) filed by Chris which sought to reopen discovery in this case in order to re-

tain an expert for the apportionment issue. *See* doc. 162.

or, in the alternative, at least that a rate of considerably less than 25% should apply to his part of the settlement. In this regard, Chris argues that he was deprived the opportunity to participate meaningfully in the settlement negotiations. However, even if the court were to accept this as true, the record indicates that Vicki's counsel advanced Chris' interests as well as Vicki's. That is, by virtue of their contingency fee arrangement, Vicki's lawyers obviously had an interest in maximizing the gross settlement, as that would inure to the benefit of Vicki, Chris, *and* said counsel. Therefore, the court concludes that any wrongful death award to Chris should be reduced by a pro rata share of Vicki's counsel's 25% contingency fee.

Vicki's counsel incurred out-of-pocket expenses totaling $31,603.47 during the course of this litigation. The court concludes that these expenses are reasonable and approves them. As with the contingency fee, the court also concludes that a pro rata share of these costs should be assessed against any award made to Chris.

**B. FELA Claim.**

The parties now essentially agree that, as a matter of law, the portion of the settlement paid by BNSF on the FELA claim in this case belongs to Vicki and her alone. Therefore, the entirety of the FELA claim, reduced by plaintiff's counsel's 25% contingency fee and a pro rata portion of the litigation expenses, will be awarded to Vicki.

The court notes, however, that the FELA award is subject to a $132,000 lien because of an advance payment made by BNSF to Vicki pursuant to the collective bargaining agreement between BNSF and Bob's union. Therefore, Vicki's net recovery under the FELA claim must also be reduced by the amount of this lien.

**C. Wrongful Death Claim.**

After subtracting the $750,000 FELA proceeds from the $1,125,000 gross settlement proceeds, the remaining amount to be apportioned to Bob's heirs as damages in the wrongful death action is $375,000, which is to be paid by the Amhof defendants. In a wrongful death action, the apportionment "shall be in proportion to the loss sustained by each of the heirs, and all heirs known to have sustained a loss share in such apportionment regardless of whether they joined or intervened in the action." [3]

Kan. Stat. Ann. § 60–1904 provides that "[d]amages may be recovered for but are not limited to: (1) Mental anguish, suffering or bereavement; (2) loss of society, companionship, comfort or protection; (3) loss of marital care, attention, advice or counsel; (4) loss of filial care or attention; (5) loss of parental care, training, guidance or education; and (6) reasonable funeral expenses for the deceased." " 'Nonpecuniary damages generally are intangible in nature such as mental anguish, bereavement, loss of society and loss of companionship.' " [4] "The Kansas Supreme Court has recognized that 'while these [intangible damages] are nebulous and impossible to equate satisfactorily with money, they nonetheless are very real and onerous to a bereaved [family member], often far outweighing in severity and permanent effect the pecuniary loss involved.' " [5]

---

**3.** Kan. Stat. Ann. § 60–1905.

**4.** *Turman v. Ameritruck Refrigerated Transport, Inc.*, 125 F.Supp.2d 444, 451 (D.Kan. 2000) (quoting *McCart v. Muir*, 230 Kan. 618, 641 P.2d 384, 391 (1982)).

**5.** *Id.* (quoting *Corman v. WEG Dial Tel., Inc.*, 194 Kan. 783, 402 P.2d 112, 115 (1965)).

Thus, the court respectfully declines to adopt Vicki's argument that, because she allegedly suffered cognizable economic loss almost equal to the total settlement amount (at least according to Dr. Grossman), and because it is uncontroverted that Chris suffered no legally cognizable economic loss, Vicki should get most (if not all) of the $375,000 now in question. The court believes, however, that the significant economic loss suffered by Vicki, coupled with the closeness of Vicki and Bob's marital relationship (in contrast to the more limited relationship between Bob and Chris), must be accorded *some* weight in the overall distribution and award.

Vicki and Chris each proved that, due to Bob's death, they sustained non-economic damages of mental anguish, suffering, bereavement, loss of society, companionship, and comfort. Further, Vicki proved economic damages of loss of service, attention, marital care, advice, protection, and loss of earnings.

Vicki argues that the Kansas legislature showed a desire to "prioritize" economic damages above non-economic damages by capping the total amount available for non-economic damages under this statute at $250,000. Given that no similar cap has been placed by the legislature on economic damages, she argues, the court in this case should award economic damages first, and use any remaining settlement funds to pay non-economic damages. The court respectfully disagrees. No case law or legislative history supports Vicki's argument. Moreover, in this particular case, it is clear to the court that, as a matter of fact, the non-pecuniary loss suffered by Vicki and Chris actually outweighs any pecuniary loss suffered by either party.

Therefore, under the facts presented in this particular case, the court will assess the statutory maximum of $250,000 for payment of non-pecuniary damages *before* apportioning any pecuniary damages. As Chris concedes that he suffered no economic loss as a result of Bob's death, the $125,000 that remains after said $250,000 will be awarded to Vicki, less the 25% contingency fee and pro rata expenses to her attorneys, as the sole heir who did suffer such damages.[6]

■ The court now moves to the relative non-pecuniary losses suffered by Vicki and Chris. Based on the evidence presented during the April 20, 2004 hearing, the court concludes that Vicki and Bob had a normal marital relationship. The evidence also shows that Chris and Bob had a normal father-son relationship. There is no question that *both* Vicki and Chris have suffered *tremendously* in a non-pecuniary sense as a result of Bob's death. The court concludes, however, that Vicki's loss of marital companionship, society, and comfort is greater than that suffered by Chris, as Bob's adult, independent son. Therefore, the court will apportion the non-pecuniary amount between the parties, by awarding $150,000 to Vicki and $100,000 to Chris. As set forth above, each of these awards will be subject to the attorneys' fees and litigation expenses incurred by Vicki's counsel, whose work produced the settlement fund.

In accordance with the foregoing findings, the court apportions the settlement proceeds as follows:

Vicki

| FELA Damages | |
| --- | --- |
| FELA Award | $750,000.00 |
| 25% Attorneys' Fee Assessment | -$187,500.00 |

---

**6.** As a result of this ruling, it is unnecessary for the court to determine the exact amount of pecuniary loss suffered by Vicki. She is the only heir eligible to receive an award for pecuniary loss. Thus, she will receive the entirety of the award for such losses, which will be the remainder of the settlement after awarding the maximum statutory damages for non-pecuniary loss.

| | |
|---|---|
| Pro Rata portion of Costs | -$ 21,068.98 |
| Lien in favor of BNSF | -$132,000.00 |
| Total | $409,429.97 |

**Pecuniary Damages from Wrongful Death Claim**

| | |
|---|---|
| Pecuniary Award | $125,000.00 |
| 25% Attorneys' Fee Assessment | -$ 31,250.00 |
| Pro Rata Portion of Costs | -$ 3,511.50 |
| Total | $ 90,238.85 |

**Non-pecuniary Damages from Wrongful Death Claim**

| | |
|---|---|
| Non-pecuniary Award | $150,000.00 |
| 25% Attorneys' Fee Assessment | -$ 37,500.00 |
| Pro Rata Portion of Costs | -$ 4,213.80 |
| Total | $108,286.20 |

**Total Settlement Award to Vicki**   $607,955.02

Chris

**Non-pecuniary Damages from Wrongful Death Claim**

| | |
|---|---|
| Non-pecuniary Award | $100,000.00 |
| 25% Attorneys' Fee Assessment | -$ 25,000.00 |
| Pro Rata Portion of Costs | -$ 2,809.20 |
| Total Award | $ 72,190.00 |

**Total Settlement Award to Chris**   $ 72,190.80

Vicki and Chris are hereby given full authority to execute releases in favor of BNSF and the Amhof defendants; take delivery of and negotiate settlement checks for collection through their respective lawyers' trust accounts for clients' monies; distribute settlement funds through said accounts as allowed or apportioned by this order; and otherwise act to finalize or consummate the settlements consistent with this order. Upon filing of a certification with this court that all of the above-described funds have been paid by BNSF and the Amhof defendants and disbursed to Vicki, Chris, and Vicki's lawyers, the court will enter an order dismissing this action, with prejudice. Unless the case is rendered moot by such an order, the court will conduct a telephone status conference with all counsel of record on **June 8, 2004, at 1:30 p.m.**

IT IS SO ORDERED.